The FORT WAYNE PATROLMEN'S
BENEVOLENT ASSOCIATION,
INC., Plaintiff,

v.

The CITY OF FORT WAYNE, a Municipal Corporation; David C. Riemen; Lawrence D. Consalvos; David J. Kiester; and Cozette R. Simon, Defendants.

Civ. No. F 85–498.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Jan. 3, 1986.

G. Stanley Hood, Roby & Hood, Fort Wayne, Ind., for plaintiff.

Phillip A. Renz, T. Dean Swihart, Grotrian & Boxberger, Fort Wayne, Ind., for defendants.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on a motion for a preliminary injunction filed by the plaintiff ("PBA"). A hearing was held on the motion on December 30, 1985, at which both the PBA and the defendants (collectively, the "City") presented evidence and arguments. At the hearing, the City offered arguments on issues relating to the justiciability of the issues raised by the PBA's complaint as well as the propriety of a preliminary injunction. No formal briefs have been filed by either side. For the following reasons, the motion for a preliminary injunction will be denied, and the complaint will be dismissed.

This case arises out of a proposed change in the City's administrative policy regarding off-duty or "outside" employment of City police officers. According to testimony at the December 30, 1985 hearing, it has long been a practice for City police officers to work part-time jobs as security personnel at various businesses in the City of Fort Wayne. A prime example of this work can be found in the approximately thirty police officers who work as security personnel at the Allen County Memorial Coliseum during concerts and sporting events. While these officers work during off-duty hours, they are nevertheless allowed to wear their Fort Wayne police uniforms and carry City-issued weapons.

Concerned that some police officers were engaging in outside employment inconsistent with their duties as police officers, and worried that the off-duty actions of officers might affect the City's ability to maintain its liability insurance or greatly increase its insurance premiums, the City decided to issue a policy directive known as "Policy III." This directive, originally issued on December 12, 1985 and subsequently amended on December 27 and December 30, 1985, required police officers engaging in outside employment to do several things:

1. to notify the Chief of Police of the outside employment;

2. if the outside employment was police, security or investigative in nature, to submit a written request to the Chief specifying the name of the employer, the nature of the work and the hours to be worked, with the Chief to approve or disapprove the request in writing within five days;

3. all such employment shall be conducted during off-duty hours, and if the outside employment should require the officer to testify in court during off-duty hours, the City will not compensate him for such testimony; and

4. all employers who hire officers for outside employment must provide proof that the officer will be protected by that employer's insurance and that the employer will hold the City harmless for liability incurred because of the officers' outside employment, or else name the City as a named insured in their liability policies.

Policy III was set to go into effect on January 1, 1986, although the City has conceded that the collective bargaining agreement between it and the PBA requires that it give five days notice before a policy change is implemented, thus making the effective date of the policy January 5, 1986.

The PBA objected to Policy III, filing this lawsuit and four grievances under the collective bargaining agreement's grievance procedures. The complaint here alleges five causes of action against the City. The first is that Policy III violates the first amendment freedom of association rights of PBA members. As explained at the December 30, 1985 hearing, Policy III acts to prevent PBA-member officers from associating with private employers in the context of outside, part-time employment. The second cause of action alleged is that Policy III violates the freedom to contract of PBA members as guaranteed by article I, § 10 of the Constitution. The third claim is that Policy III violates the equal protection clause of the fourteenth amendment. As originally stated in the complaint, the violation arose from the fact that the Chief of Police had complete discretion to approve or disapprove a request for permission to engage in outside employment. At the December 30, 1985 hearing, however, the equal protection argument centered around the fact that the appeals process set up in Policy III in response to the PBA's complaint only gave an officer a written decision by the Board of Public Safety, whereas other appeals mechanisms in the police department gave an officer a full hearing before the Board. The fourth cause of action claimed a deprivation without due process of law of police officer property interests in the expectation of working off-duty. The final claim by the PBA is that Policy III violates provisions of the collective bargaining agreement between the City and the PBA relating to the disclosure of sources of income, compensation for testifying in court, and consideration of changes by a Labor Management Committee set up under the agreement. The complaint asks for a preliminary in-junction, a declaratory judgment, and compensatory and punitive damages in the amount of $500,000.00.

At the hearing on the request for a preliminary injunction, the City raised two issues concerning the justiciability of these claims. The first is the issue of ripeness, while the second relates to the PBA's standing to bring this suit on behalf of its members. Because those issues go directly to the ability of the court to consider the PBA's suit at all, the court will consider them first. The court will then examine whether the PBA meets the standards for the issuance of a preliminary injunction.

*I. Ripeness*

The doctrine of ripeness arises out of article III of the Constitution, which requires the existence of an actual case or controversy and prohibits the rendering of advisory opinions. *See Wisconsin's Environmental Decade, Inc. v. State Bar of Wisconsin,* 747 F.2d 407, 410 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985). Ripeness is a prudential question, *American Booksellers Ass'n, Inc. v. Hudnut,* 771 F.2d 323, 327 (7th Cir.1985), and although the difference between an abstract question calling for an advisory opinion and a ripe case or controversy is not discernable by any precise test, *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), the basic inquiry is whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality, so as to warrant judicial relief. *Babbitt,* 442 U.S. at 298, 99 S.Ct. at 2308; *American Booksellers Ass'n.,* 771 F.2d at 327. A case is not considered ripe if the issues are not formed or the application of a challenged statute or regulation is not certain, *Wisconsin's Environmental Decade,* 747 F.2d at 411. A plaintiff must demonstrate a "realistic danger of sustaining a direct injury" as a result of the defendant's action, although he need not wait until the injury is consummated if it is "certainly impending." *Babbitt,* 442 U.S.

at 298, 99 S.Ct. at 2308; *Lartnec Inv. Co. v. Fort Wayne-Allen County Convention and Tourism Auth.*, 603 F.Supp. 1210, 1216 (N.D.Ind.1985).

The PBA alleges that its members will suffer two types of injuries if Policy III goes into effect: they will lose outside employment income that they currently receive and certain constitutional rights will be violated. The court will analyze each of these alleged injuries in turn.

### A. *Loss of Outside Employment Income*

■ The PBA believes that Policy III will prevent its members from having jobs outside of the police department. An examination of the language of Policy III does not indicate that it prohibits outside employment entirely. Lawrence Consalvos, the Director of Public Safety for the City, testified that a total ban on outside employment was considered but rejected by the City. Thus, to show an injury here, the PBA must establish that the *effect* of Policy III's implementation will be to prevent members from continuing in their outside jobs.[1]

At the hearing on the request for a preliminary injunction, the PBA argued that the provisions requiring an outside employer to indemnify the City for actions taken by the police officer while working in his outside job would cause some employers to fire the officers working for them because they would refuse to hold the City harmless in such a situation. The only evidence offered by the PBA concerned two employers: the Allen County Memorial Coliseum and Spiece, Inc. Two of the PBA's witnesses testified that the Coliseum management had decided to fire the thirty officers who worked there if Policy III went into effect, but Robert TenBarge, the Colise-

um's Manager, testified that no decision had been made as to whether a hold harmless agreement could be signed because such a matter would have to be presented to the Board of Trustees of the Coliseum first. Gerald Mongovan, a lieutenant on the police force who works at Spiece, testified that he was advised that Spiece would not hire PBA members because it will not comply with the requirement of Policy III concerning a hold harmless agreement.

What is significant to note about the PBA's testimony concerning the reaction of management at the Coliseum and Spiece is that the reaction was to the *original* form of Policy III. In that version, an employer had only one choice: sign a hold harmless agreement or not employ off-duty officers. The revised form of Policy III offers a second alternative: the employer could add the City as a named insured to the employer's liability policy. The PBA witnesses indicated that both the Coliseum and Spiece have insurance policies which cover liability created by the acts of employees. This second option is much narrower in scope, and therefore more attractive, than the first option. An amendment to an employer's liability policy, which already covers the off-duty officer's acts as an employee, would name the City as an insured only for acts done by officers working off-duty for the employer. This contrasts sharply with the potential liability posed by signing a blanket hold harmless agreement. Thus, the revised version of Policy III makes it much more possible that employers might accept Policy III and continue to employ off-duty officers, with no subsequent loss in outside income. The complete lack of evidence on employer reaction to the revised version of Policy III, and the attractiveness of the second alternative under the

---

1. The PBA has also expressed fear that the implementation of Policy III by the Chief of Police will result in arbitrary and capricious decisions on approval and disapproval of requests filed with the Chief. However, Chief of Police David Rieman testified that his concern is over outside employment which is inconsistent with duties as an officer. The revised form of Policy III specifically provides that the Chief must find that

the outside employment "conflicts with the officer's duties as a police officer or is not commensurate with the officer's special identification by the public as an upholder of the law...." The policy therefore limits the Chief's discretion, and thus the fact that the policy gives the Chief approval authority will not cause officers to suffer injury. Therefore, the court focuses on the effect of the policy on outside employers.

policy, makes the likelihood of injury much less than "certainly impending." [2]

The court therefore finds that the alleged loss of outside employment income is too uncertain to constitute a "realistic danger of direct injury" which is "certainly impending." Thus, this cause cannot be considered "ripe" on the basis of this alleged injury.

### B. Constitutional Violations

■ The second type of injury alleged by the PBA is that certain constitutional rights will be violated by the implementation of Policy III. These rights include the first amendment right to freedom of association, the freedom to contract, and the due process and equal protection provisions of the fourteenth amendment. It is important to note initially that, with the possible exception of the first amendment claim,[3] these constitutional violations do not occur until the policy is actually implemented and used against an officer. For example, the due process claim relates to the appeals process set up in Policy III. That process allows an officer whose request has been denied by the Chief to appeal to the Director of Public Safety and ultimately to the Board of Public Safety. The constitutional violation (if any) present in the use of such an appeals process will not occur until the process is actually used. For the court to rule on the adequacy of the process before it is used to some officer's detriment is to engage in the rendering of an advisory opinion on the constitutional sufficiency of the process.

An interesting case in this regard is *Vorbek v. Schnicker*, 660 F.2d 1260 (8th Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982). There, several police officers and a police officers' association brought an action against the police commissioners of the City of St. Louis to have certain personnel regulations declared unconstitutional. The regulations had in fact been issued and were in effect at the time of the suit, and included a provision which subjected an officer to disciplinary action if he engaged in outside employment without permission of the chief of police. One officer testified that he had refused an actual offer of outside employment because he did not want to go through the procedures required by the regulations. The *Vorbeck* court found that the case was not ripe for adjudication because the regulations had not yet been enforced against any of the plaintiffs. 660 F.2d at 1265–66. *Vorbeck* is completely consistent with the principles of the ripeness doctrine as outlined above. It requires a court to wait until a regulation is enforced before it should consider a claim based on the effect of the regulation.

*Vorbeck* is clearly applicable in this case. There, the regulations were promulgated and in effect, while here the regulations have not yet even gone into effect. In *Vorbeck*, there was evidence that an officer had actually turned down an offer of employment, while here it is speculative that any police officers will lose their jobs, given the second alternative available to outside employers discussed above. If the claims in *Vorbeck* were not ripe, then clear-

---

**2.** Admittedly, the accelerated timetable of this case has limited the ability of the PBA to gather evidence concerning the impact of Policy III on outside employers. However, the ripeness doctrine does not excuse a plaintiff from its burden to show a "realistic danger of sustaining a direct injury" in order to remain in court. The PBA apparently believed that the revised Policy III was susceptible to the same analysis as the old version of the policy when it came to employer reactions to the policy, and therefore presented evidence relating only to the old version. The significant changes made in the revised version dilute the certainty of injury suggested by that evidence, and the PBA did not attempt to show how employers would react to those changes.

The court must judge the probabilities of injury on the evidence before it.

**3.** In the context of a claim under the first amendment, it is possible for a law or regulation to force an individual to alter his conduct even though the law or regulation has not yet been enforced against him. Such an effect would constitute a "chilling" of his first amendment right (if the conduct is protected by the first amendment). *See Wisconsin's Environmental Decade*, 747 F.2d at 411 and n. 5. The court will therefore consider the first amendment claim here separately.

728

ly this action is premature and not ready for adjudication.

▮ The first amendment claim asserted here is the right to associate with outside employers in the context of part-time employment. The court seriously doubts that the first amendment right to freedom of association is designed to protect employer-employee relationships; if it did, every firing of an at will employee, every breach or tortious interference with an employment contract, and every aspect of employer-employee relations would have constitutional dimensions, and no court has adopted such a proposition. From the seminal case of *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), case law concerning the freedom of association has involved association for the purpose of expression and belief. This "speech-related" aspect of the freedom of association is clearly absent in the case of a police officer who works part-time for an outside employer. The employer-employee relationship in this context is simply a contractual arrangement whereby employer and employee exchange mutually beneficial resources. To imbue that relationship with constitutional dimensions is to go far beyond the limits of constitutional construction.

▮ Even if some kind of associational right existed, there has been no showing of any kind of chilling of this right, nor any substantial threat to the right posed by the implementation of Policy III. No showing has been made that any employer or employee has altered his conduct in response to the policy; the only evidence offered was the evidence concerning the Coliseum and Spiece. As noted before, none of this evidence addressed the issue of the revised Policy III, with the alternative of including the City as a named insured. Thus, employers may find Policy III acceptable in its now present form, in which case Policy III would not affect outside employment activities at all. Chief Rieman indicated that his concern about outside employment was limited to employment inconsistent with official duties. Perhaps he will not disapprove of any requests concerning outside employ-

ment, in which case the associational rights (as well as the other constitutional rights and the economic concerns) of the police officers will not be affected. This court simply does not have sufficient information before it to predict what will occur under Policy III precisely because the outcome of implementation of the policy is pure speculation at this point. This speculative nature of the injuries which might occur under the policy mandate that this court dismiss this case for a lack of justiciability because the controversy implicated in it is not ripe for adjudication.

## II. Standing

▮ The City argues that the PBA, the only named plaintiff in this case, does not have standing to bring this action. The question of standing to bring a suit is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial power on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Standing involves the constitutional limitation on federal court jurisdiction requiring an "injury in fact"— the requirement that a plaintiff show that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The injury must be "real, not imaginary; concrete, not abstract; apparent, not illusory; and demonstrable, not speculative." *J.N.S., Inc. v. State of Indiana*, 712 F.2d 303, 305 (7th Cir.1983); *Myron v. Chicoine*, 678 F.2d 727, 730 (7th Cir.1982). The standing of PBA is derivative of its members' standing, *see Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); *United Beverage Co. v. Indiana Alcoholic Beverage Commission*, 760 F.2d 155, 156–57 (7th Cir.1985). In order for the

PBA to have standing to bring a suit on behalf of its members, three requirements must be met: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

The problem for the PBA is in the requirement that its members have standing to sue in their own right. Individual PBA members would have to show an "injury in fact," which the analysis above concerning ripeness indicates would be impossible. The injuries alleged here are speculative and not concrete, because Policy III has not yet gone into effect and the actual effects of operation are unclear at this time. Because PBA members have no standing to sue at this time, the PBA has no standing as well. The case must therefore be dismissed.

### III. Request for Preliminary Injunction

Even if the PBA could overcome the problems of ripeness and standing, its request for preliminary injunction would fail. The Seventh Circuit has recognized that a party requesting a preliminary injunction must establish the following elements: (1) that he has no adequate remedy at law or will suffer irreparable harm if the injunction is denied; (2) that the harm he will suffer is greater than the harm the defendant will suffer if the injunction is granted; (3) that the plaintiff has a reasonable likelihood of success on the merits; and (4) that the injunction will not harm the public interest. *ON/TV of Chicago v. Julien,* 763 F.2d 839, 842 (7th Cir.1985); *Palmer v. City of Chicago,* 755 F.2d 560, 576 (7th Cir.1985). A plaintiff has the burden of proving each of these factors. *Palmer,* 755 F.2d at 577; *Godinez v. Lane,* 733 F.2d 1250, 1257 (7th Cir.1984). An examination

of the PBA's claims reveals that the PBA fails to establish any of these elements.

### A. Adequate Remedy at Law/Irreparable Harm

Although the Seventh Circuit speaks of this first element in the disjunctive (no adequate remedy at law *or* irreparable harm), there is authority to the effect that both parts of this element must be present in order to satisfy this first element. *See Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984). To determine whether this first element is satisfied, the court will analyze each injury claimed here to determine whether PBA members will suffer irreparable harm and have no adequate remedy at law.

#### 1. Freedom of Association

As noted before, the PBA argues that Policy III acts to abridge its members' rights to freely associate with outside employers through part-time work. There was no mention made of any association for the purpose of expressing or advancing any beliefs or opinions. As characterized by the PBA, the claimed right exists in police officers working for the outside employers, which can only mean that the PBA is asserting a right to freedom of association in the very fact of an employer-employee relationship. As the court found above, there is no recognized freedom of association between employer and employee in the context of their employment relationship. Thus, there can be no irreparable harm here because there is no violation of any first amendment right. The first element is therefore absent as to this claim.

#### 2. Freedom to Contract

The PBA's second claim is that Policy III will violate the freedom to contract which its members currently enjoy with respect to outside employers. The PBA argues that this freedom is recognized in article I, § 10 of the Constitution, which states in pertinent part: "No state shall ... pass any ... Law impairing the Obligation of Contracts."

An examination of the language of article I, § 10 clearly reveals that the

specific clause relating to contracts does not recognize any freedom to contract. In fact, there are many laws, both civil and criminal, which may restrict one's ability to enter into a contract, and those laws are not subject to constitutional questions. Rather, article I, § 10 is clearly designed to restrict states from passing laws which affect existing contractual obligations. The Supreme Court has stated that in analyzing a claimed violation of the impairment of contracts clause of article I, § 10, "the threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704-05, 74 L.Ed.2d 569 (1983), quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978). Thus, to the extent that the PBA is claiming a constitutional right to the freedom to contract, that right does not exist by virtue of article I, § 10, and thus no irreparable harm could occur.

■ If the court interprets the PBA's claim as asserting that Policy III impairs the obligations set out in the contracts between police officers and outside employers, then it must examine the nature of those contracts so as to determine whether there is a "substantial impairment." There was no evidence offered that any police officers are employed under any particular types of contracts. Under Indiana law, if an employment contract is not for an express period of time it is considered to be a contract for employment at will, and may be terminated at any time for any reason by either party. *Pepsi-Cola Bottlers, Inc. v. Woods*, 440 N.E.2d 696, 697 (Ind.App. 1982); *Campbell v. Eli Lilly and Co.*, 413 N.E.2d 1054 (Ind.App.1980). Thus, the police officers do not have any great expectation of employment because they could be fired at any time and for any reason.

Policy III does not change those at will contracts at all. It does, however, act to change the conditions surrounding the outside jobs that police officers work. An outside employer may consider those changes to be worth enduring because he likes the advantages gained by employing police officers, in which case the at will contracts will continue. Or the employer may decide that the changes make employing off-duty officers too expensive or risky, in which case he would fire the officer, which is clearly within his power as an at will employer. In either case, the contract remains the same—an at will employment contract. Thus, Policy III does not substantially impair the obligations of the outside employment contracts, and therefore the PBA fails to make out a claim under article I, § 10, and therefore there is no irreparable harm in this claim which would satisfy the first element here.

3. Equal Protection and Due Process

■ The PBA's third claim is that the review process set out in revised Policy III violates equal protection because it does not give a full hearing before the Board of Safety as is available for some other reviews, but allows only a written review of a decision not to approve an officer's outside employment. The fourth claim also focuses on the review process, claiming that the property rights in having outside employment currently enjoyed by officers will be taken away without due process because two of the reviewers (the Chief of Police and the Director of Public Safety) are the authors of Policy III.

Assuming that some reviews by the Board of Safety are conducted with full hearings (and the court must assume, as the PBA has offered no evidence to establish this fact), it is possible to say that the written review provided under Policy III creates a "class" of review different from these full hearing reviews so as to raise equal protection concerns. Because this "classification scheme" is based on the type of review received, and not upon some suspect class like race or the exercise of some fundamental personal right, the court must review the PBA's equal protection claim under the "rational relationship" test. *Plyler v. Doe*, 457 U.S. 202, 216-17, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786 (1982);

*Peterson v. Lindner,* 765 F.2d 698, 705 (7th Cir.1985); *Sklar v. Byrne,* 727 F.2d 633, 636 (7th Cir.1984). This test upholds a classification if it is rationally related to a legitimate state interest, or, as the *Plyler* Court put it, if it "bears some fair relationship to a legitimate public purpose." 457 U.S. at 216, 102 S.Ct. at 2394; *Peterson,* 765 F.2d at 705. The classification is presumed rational, and the plaintiff bears the "heavy burden" of demonstrating that "the varying treatment of different groups of persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." *Hodel v. Indiana,* 452 U.S. 314, 322, 101 S.Ct. 2376, 2382, 69 L.Ed.2d 40 (1980).

The "legitimate state purpose" behind Policy III is the protection of the City from loss of insurance coverage (which could have the effect of curtailing municipal services should the City decide that the best way to protect itself from uninsured liability is to reduce the opportunities for liability to arise by performing fewer services) as well as preventing the damage to the reputation and effectiveness of the police force through police officers engaging in off-duty jobs inconsistent with official duties. Both of these concerns relate directly to the administration of the City's law enforcement responsibilities, and therefore are clearly "legitimate." While the written review provisions of Policy III were added to address the PBA's due process concerns, this review mechanism could assist the City in pursuing its policies by providing a further layer of review as to whether an officer's outside employment will conflict with these legitimate objectives. The fact that the review is not a full hearing type of review is immaterial; an officer's written request for review by the Board can include the facts which will bring the question of conflict with City objectives into sharper focus, thereby assisting the Board in providing its beneficial review. Viewed in this context, the provision of written review is rationally related to the legitimate interest in effective law enforcement, and therefore the PBA's claim of an equal

protection violation would not suggest any irreparable harm because no violation would be present here.

■ The PBA's due process claim contends that the three-tier review process of requests for approval of outside employment is constitutionally flawed because all three levels are tainted by the presence of the authors of Policy III (the Chief of Police and the Director of Public Safety). As an initial matter, the court notes that the mere fact of authorship does not establish any prejudice on the part of either the Chief or the Director. The PBA has presented absolutely no evidence that either person is somehow prejudiced against officers requesting approval for outside employment; in fact, the testimony of Chief Rieman and Director Consalvos indicated that both are not opposed to outside employment provided the insurance and conflict of duties concerns behind Policy III are satisfactorily met. Thus, the factual premise behind the due process claim is simply untrue.

■ Assuming, however, that some prejudice could be shown, the PBA would have to establish some right to due process greater than the review provided in Policy III. The Supreme Court has stated:

> The requirements of procedural due process apply only to the deprivation of interests emcompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of hearing is paramount. But the range of interests protected by procedural due process is not infinite.

*Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). In order to claim a right to due process, the PBA must show that some property right protected by the fourteenth amendment is deprived by Policy III.

To the extent that the property interest is alleged to be the outside jobs themselves, that interest is not encompassed by the fourteenth amendment so as to justify procedural due process protections. Property

interests are "created and their dimensions are defined by existing rules or understandings ... that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. For a job to constitute a benefit worthy of being considered a property interest, "a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.; Hadley v. County of DuPage,* 715 F.2d 1238, 1241 (7th Cir.1983), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984). The jobs at issue here, however, are at will—the police officers could be fired at any time for any reason by their outside employers. Thus, the officers have no legitimate claim to continued employment. In such a situation, it is difficult to see how the outside jobs can be a property right.

Perhaps the PBA could argue that Policy III nevertheless changes the outside employment by denying officers the opportunity to work for a particular outside employer. The alleged property right would be the opportunity to pursue outside employment, which is much more of a liberty interest than a property right. The *Roth* Court recognized that a liberty interest can be implicated when a state imposes a stigma or other disability on an individual which forecloses his freedom to take advantage of other employment opportunities. *Id.,* 408 U.S. at 573–74, 92 S.Ct. at 2707. *See Perry v. FBI,* 759 F.2d 1271, 1277 (7th Cir.1985). Yet Policy III does not "foreclose" employment opportunities— there has been no evidence to suggest that police officers will not be able to find off duty employment once the revised form of Policy III goes into effect, especially in light of the fact that Policy III requires approval only for security and investigative outside employment. In short, Policy III does not amount to a deprivation of the liberty interest in being able to seek outside employment.

Finally, the fact that the City may have allowed outside employment for several years does not necessarily create any expectation in continued toleration on the City's part. The Seventh Circuit has clearly stated that "longevity alone does not create a property interest." *Hadley v. County of DuPage,* 715 F.2d at 1244, quoting *Bollow v. Federal Reserve Bank of San Francisco,* 650 F.2d 1093, 1099 (9th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982).

Thus, the PBA has failed to identify any liberty or property interest which would justify procedural due process. Therefore, no irreparable harm can exist here because no constitutional violation of due process can occur.

### 4. Violation of the Collective Bargaining Agreement

■ The fifth and final claim of the PBA is that Policy III violates the collective bargaining agreement between the PBA and the City made and entered on May 23, 1985. Three violations are alleged. The first relates to the promulgation of Policy III itself. The PBA claims that Policy III should have been referred to a Labor Management Committee which the collective bargaining agreement mandated should be established, and all parties agree that the Committee did not review Policy III. The remaining two violations involve specific provisions in Policy III relating to notification to the Chief of Police as to where an officer is working and to compensation for testifying in court. The court considers each of these alleged violations in turn.

Article V, § 2 of the agreement provides that

The Union recognizes that the Employer reserves the right to establish rules, and/or change existing rules affecting work conditions. It is agreed that all such rules shall be reasonable in content and application. Disputes arising therefrom shall be subject to the grievance procedure ... Within sixty (60) days from the date of this Agreement, the parties shall create a Labor-Management Committee consisting of three (3) repre-

sentatives from each party. This Committee shall meet at least monthly for purposes of reviewing standard operating procedures and corresponding rules and regulations of the Department.

From this language, it is clear that the City is not required to present rules to the Labor Management Committee for approval prior to implementation of those rules. In fact, the first sentence of the quoted language indicates that the City retains the right to issue new rules and regulations. This section of the collective bargaining agreement merely assigns a review or advisory role to the Committee, as is implicit in the fact that the Committee is required to meet on a monthly basis and not whenever new rules are proposed. Thus, no violation of this provision occurred in the failure of the City to present Policy III to the Committee prior to its promulgation.

 The PBA claims that the requirement of Policy III that an officer notify the Chief of Police where and when he is working violates the Police Officers' Bill of Rights set forth in Article XII of the collective bargaining agreement, which provides in pertinent part:

No police officer shall be required or requested for purposes of job assignment or other personnel action to disclose any item of his property, income, assets, source of income, debts or other personal or domestic expenditures (including those of any member of his family or household) unless:

(a) such information is obtained under proper legal procedure, or

(b) there is probable cause to believe that bribes or other improper inducements may have been given to such police officers.

According to the PBA, telling the Chief of Police where an officer works and when he works in the context of a request for approval under Policy III constitutes a requirement to reveal sources of income.

The important limiting language in this section of the Police Officers' Bill of Rights is that the disclosure is requested or required "for purposes of job assignment or other personnel action." Because Policy III only applies to time when an officer is off duty, it is clear that the disclosure of where the officer is working cannot be for purposes of job assignment. Thus, the notification requirement must fall under the "other personnel action" provision for this part of the collective bargaining agreement to apply at all.

There has been no evidence offered on what the drafters of this provision meant. David Becher, the president of the PBA, testified that he interprets "other personnel action" to mean "anything which affects me as a police officer." However, such an interpretation is far too broad. There are many actions taken by a police department which affect an officer but which would not generally be considered "personnel actions"—for example, a change in squad room procedure. A more likely and reasonable interpretation of this language is "actions which affect an officer's status or position as an officer"—discipline, promotions, pay increases and the like. Under this interpretation, a request for notification of where and when an officer works when off duty has absolutely no effect on or involvement in his status as an officer. The court concludes that this provision of the collective bargaining agreement is not implicated in the operation of Policy III.

 The last provision of the collective bargaining agreement allegedly violated by Policy III relates to compensation for testifying in court. The revised version of Policy III provides:

Required court appearances in connection with part-time employment which are scheduled during the officer's normal working hours may be attended as part of the officer's normal tour of duty. Required court appearances in connection with part-time employment which are scheduled during the officer's scheduled or elected days (or time) off shall not be compensated by the Department or the city, and are the sole expense of the officer and/or part-time employer.

The provision of the agreement allegedly violated by this section of Policy III is Article XLIV, § 1, which provides:

> Officers who are required to attend court on off-duty hours shall be compensated in the following manner:
>
> (a) Officer receives pay for one and one-half the actual time spent in court.
>
> (b) Officer receives one hour travel time at his/her straight time hourly rate.

The language of Article XLIV appears to be absolute—that is, if an officer is subpoenaed to appear in court for any reason during his or her off duty hours, the contract apparently requires the City to pay for so appearing under the formula set out in § 1. Perhaps that is not what the City intended; it seems like unusual largesse on the City's part to pay for court appearances by police officers in cases unrelated to their work as police officers, but § 1 does not make that distinction, and thus the City appears to have contractually agreed to pay for any off duty testimony. Under this interpretation of Article XLIV, Policy III does appear to violate the collective bargaining agreement.

However, a violation of the collective bargaining agreement does not necessarily mean that the PBA has shown the requisite irreparable harm. In the language of the agreement quoted above concerning the Labor Management Committee, the agreement makes clear that rules changes are subject to grievance under the contract. In addition, Article IX of the agreement defines a grievance as "any dispute concerning the interpretation or application of this Agreement," so that a refusal to pay compensation for off duty testifying would be a grievable issue. Thus, an officer would have a remedy available to him. Further, the harm to the officer would be purely monetary—the lost compensation. Thus, the harm can be repaired by an award on monetary damages. Article IX allows for the commencement of a lawsuit in an appropriate court to enforce an arbitrator's ruling on the grievance. Such an action would be for breach of contract, a proper and adequate remedy at law. In short, although Policy III may violate the collective bargaining agreement, there is no irreparable harm and there is an adequate remedy at law available. Therefore, the first element for injunctive relief is not present for these contract claims.

In summary, the PBA has failed to show that any of its claims pose threats of irreparable harm without an adequate remedy at law so as to justify injunctive relief. The first element of the four part test is therefore clearly absent here.

### B. Balancing of Harm to the Parties

The second element of the four part test requires that a plaintiff show that the harm he will suffer absent injunctive relief is greater than the harm the defendant will suffer if an injunction is granted. As noted in the previous section of this order, the PBA has alleged no competent harm. By contrast, the Director of Public Safety for the City testified that the City's liability insurance underwriter has indicated that the City's policy might not be renewed unless the City undertakes administrative policy changes designed to reduce the City's potential liability. Even if the insurance is not cancelled, the premium will probably increase dramatically, perhaps by 200%. Testimony established that the implementation of policy changes such as Policy III might help to slow the increase in the premium. Thus, the City faces serious problems in maintaining its insurance coverage, slated for renewal in January, 1986. To grant an injunction would prevent the City from instituting the policy changes that might lessen those financial problems. Compared against the negligible harm identified by the PBA, the balance clearly tips in favor of the City. Thus, the second element is absent here.

### C. Likelihood of Success on the Merits

The third element measures a plaintiff's likelihood of succeeding once the case goes to trial. The analysis of the claims above indicates that none of the PBA's claims have any merit except the claim that the compensation provision for off duty testifying in court may violate the collective bar-

gaining agreement. However, no member of the PBA has yet been denied compensation under that provision, and the presence of the grievance mechanism in the collective bargaining agreement might subject a suit to dismissal for failure to exhaust contractual remedies. In short, the likelihood of success on the merits is not great.

### D. Public Interest

█ The final element examines the harm to the public's interest caused by granting the injunction. Here, the potential harm is great. The injunction would prevent the City from adopting policies to limit liability exposure, which could lead to a loss of liability insurance, or at least greatly increased insurance costs. The citizenry would be subject having to pay the increased costs of government in the latter case, and possibly be subject to reduced and less effective governmental services as the City scrambles to reduce its potential liabilities without insurance. This poses a threat to the public interest, and therefore the fourth element of the four part test for injunctive relief mandates that no injunction issue.

Thus, the PBA has failed to show that all four elements of the test for injunctive relief have been satisfied, and therefore the request for a preliminary injunction would be denied if the PBA was able to overcome its ripeness and standing problems.

### *Conclusion*

For the reasons set forth above, the request for a preliminary injunction is hereby DENIED. The court also hereby DISMISSES this cause on its own motion because this controversy is not ripe and the plaintiff has no standing to bring it.