75 N.J. Super. 571 (1962)
183 A.2d 684
STATE OF NEW JERSEY, BY DAVID D. FURMAN, ATTORNEY GENERAL, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
PLAINFIELD-UNION WATER COMPANY, A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
STATE OF NEW JERSEY, BY DAVID D. FURMAN, ATTORNEY GENERAL, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
ELIZABETHTOWN WATER CO. CONSOLIDATED, A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 18, 1962.
Decided July 19, 1962.
*573 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. William M. Feinberg argued the cause for plaintiff-appellant and cross-respondent (as against Plainfield-Union Water Co.) (Mr. William M. Feinberg and Mr. Charles J. Kehoe, of counsel; Mr. William M. Feinberg and Mr. Alan Goldstein, on the brief).
Mr. H. Douglas Stine argued the cause for plaintiff-appellant and cross-respondent (as against Elizabethtown Water Co. Consolidated) (Mr. H. Douglas Stine and Mr. Charles J. Kehoe, of counsel).
Mr. John R. Sailer argued the cause for both defendants-respondents and cross-appellants.
*574 The opinion of the court was delivered by KILKENNY, J.A.D.
The State of New Jersey sued the defendant water companies (hereinafter distinguished as "Plainfield-Union" and "Elizabethtown"  though consolidated since June 30, 1961) to obtain custody of certain moneys in their possession and unclaimed for more than five years by the persons entitled thereto, pursuant to the provisions of the Custodial Escheat Act, N.J.S. 2A:37-29 et seq., effective July 13, 1951. Suit in each instance was in the Superior Court, Chancery Division. The Plainfield-Union complaint was filed on April 10, 1959 and the complaint against Elizabethtown was filed on March 26, 1957.
The moneys involved in the Plainfield-Union case are (1) wage claims; (2) deposits for the security of the payment of bills; and (3) refunds due under certain water main extension agreements. In the Elizabethtown action, besides the aforesaid three items the State also sought custody of (4) dividends declared but unpaid; (5) checks issued but not presented for payment; and (6) a bond coupon #87 payable to bearer in the amount of $25 as of May 1927.
In the suit against Plainfield-Union, the trial court rendered a judgment giving custody to the State of (1) wage claims aggregating $129.47; (2) deposits for the security of the payment of bills in the amount of $474.88, including 4% interest; and (3) refunds due under certain main extension agreements in the amount of $24,952.91, limiting the State's right of custody in each instance to amounts which became due and payable between July 13, 1945 (six years prior to the effective date of the Custodial Escheat Act, supra) and April 9, 1954 (five years prior to the institution of the action). It denied the State custody of any amounts which became due and payable before July 13, 1945 on the ground that they were debts from the company to the depositors barred by the statute of limitations at the time of the adoption of the Custodial Escheat Act and thus beyond the purview of that act. State by Parsons v. United *575 States Steel Corp., 22 N.J. 341 (1956). Cf. State by Parsons v. Standard Oil Co., 5 N.J. 281 (1950).
The trial court also held that as between the depositors and the utility, after the company had returned the amount called for under certain formulae in the extension agreements, the utility was under no further obligation to the depositors even though the amount returned was not equal to the full amount deposited. It therefore held that there was no right of escheat to such sums even where the statute of limitations had not run on the claim.
The judgment in the Elizabethtown case awarded custody to the State of (a) dividends aggregating $6471.50 which became due and payable prior to March 18, 1952 as to which there is no dispute; and the following items which became due and payable between July 13, 1945 (six years before the effective date of the Custodial Escheat Act) and March 18, 1952 (five years before institution of this suit), to wit., (b) deposits for the security of the payment of bills in the amount of $2479.11, including 4% interest; (c) wage claims in the amount of $56.33; (d) checks not presented for payment in the amount of $319.10; and (e) refunds due under certain main extension agreements in the amount of $4922.14. It also gave the State custody of the $25 due on the 1927 bond coupon, concluding that this item had not been commingled with the company's funds, had been deposited with the National State Bank of Elizabeth for safekeeping for the benefit of the bondholder and was, therefore, a trust against which the statute of limitations would not run.
As in Plainfield-Union, the trial court denied the State custody of any sums payable or refundable by Elizabethtown prior to July 13, 1945 because of the statute of limitations, holding that the relationship of the company to the obligee was that of debtor and creditor and claims dating beyond that date not within the purview of the act. It also held that even where the statute of limitations had not run on the claim there was no right of escheat except as to those *576 sums returnable under the formulae in the extension agreements, even though such sums were not equal to the full amount deposited.
In both cases the trial courts held that notwithstanding the statute of limitations, custody of deposits refundable under the main extension agreements since July 13, 1945 should be awarded to the State because the water companies admittedly never reported these escheatable funds to the State as required by N.J.S. 2A:37-42 and were thereby estopped from relying upon the statute of limitations for the six-year period prior to July 13, 1951, the effective date of the Custodial Escheat Act, N.J.S. 2A:37-29 et seq. State by Parsons v. United States Steel Corp., supra.
The State has appealed only from those portions of the judgments which denied it custody of all unrefunded balances of deposits made under the main extension agreements. It argues that the depositors under these agreements were entitled to a return of their deposits in full and were not limited to a right to such amounts as were specified by the formulae in the agreements; that these deposits were trust funds, and not mere debts; and that, as such, the statute of limitations does not apply thereto.
The defendant water companies cross-appealed from those parts of the judgments which gave the State custody of any sums due and payable since July 13, 1945 though more than six years prior to the institution of the respective suits, contending that such sums are debts barred by the six-year statute of limitations, N.J.S. 2A:14-1, notwithstanding the contrary decision in State by Parsons v. United States Steel Corp., supra.

I.
Since 1923 the defendant water companies have required land developers and individual property owners who desired an extension of the water main to their developments or properties to enter into written agreements and to make deposits thereunder whenever the cost of the extension would *577 exceed 3 1/2 times the estimated annual revenue to be derived by the water companies therefrom. This practice was sanctioned by the Public Utility Commission and was in accordance with its rules and regulations adopted in 1923 suggesting the procedure to be followed in such cases and the terms and conditions to be inserted in such agreements. These voluntary arrangements avoided the necessity of applications to the Commission for formal orders requiring the utility company to make the extension under R.S. 48:2-27. See Thomas "Public Utilities: Extension of Service," 16 Rutgers L. Rev. 318 (1962), for an exposition of these voluntary arrangements in contrast with orders by the Public Utility Commission.
Seven different forms of extension agreements have been used by the defendant water companies since 1923, but in each contract the water company undertook to extend its water main to the development or property at its own cost and expense; the developer or property owner paid a specified sum to the water company to cover the cost of the extension; and an express provision was made for the return of the deposit without interest either at a fixed amount per house connection or at a rate of 3 1/2 times the estimated annual revenue to be derived from each house as and when connected to the water main. The agreements generally provided that total refunds should, in no event, exceed the total amount deposited. Except for Type C contract and Type G  the latter used only four times  the main extension agreements provided that after a period of ten years from date of the agreement "all deposits not then returned to the applicant or his assigns shall be the property of the Water Company," or contained a ten-year provision of similar import.
Type C contract contained no such ten-year provision. It prescribed the following manner for the return of the deposit without interest:
*578 "* * * as houses are connected to and supplied with water from said extension, Water Company will make an estimate of the annual revenue to be derived from each house and will return to us Three Dollars and 50/100 ($3.50) for each One Dollar ($1) of such estimated revenue. It is also agreed that should the municipality pay the Inch Foot Fire Service Charge on this line, Water Company will return to us Three Dollars and Fifty Cents ($3.50) for each One Dollar of said Fire Service Charge."
Application of the formulae set forth in these main extension agreements for the return of the deposit has not produced, in many instances, a full return of the deposit. This result has occurred not only in cases where the land developer has failed to carry out his intended program, but also where the development has been completed and no further house connections can be made. We are informed that more than $300,000 has been accumulated by these water companies since 1923 in unrefunded deposits under these extension agreements. The books of the companies reflect these unpaid balances but, under regulations of the Board of Public Utility Commissioners, they are not includable in the capital base for the rate-making process. These deposits have, without objection, been commingled with the general funds of the companies from the time of their receipt and have been used unrestrictedly by them.
The State stresses the following factors to support its contention that the extension agreement deposits are trust funds and not mere debts: (1) they are returnable "without interest"; (2) the agreements require the water company to extend the water main at its "own cost and expense"; (3) the deposits are to be "returned" or "refunded," and not merely repaid; and (4) any ambiguity in the contracts should be resolved against the water companies which admittedly prepared the contracts, thereby avoiding a forfeiture of the depositor's money.
State v. Atlantic City Electric Co., 23 N.J. 259, 266 (1957), laid down these rules of guidance for determining whether a deposit of money created a trust or a debt:
*579 "Whether a trust or a debt is created when one party pays money to another primarily depends upon their intentions. State v. United States Steel Co., 12 N.J. 51 (1953). Frequently there is no explicit understanding as to the terms upon which the payee is to hold the funds, and then the nature of the transaction must be divined through consideration of the parties' behavior and the attendant circumstances. State v. Western Union Telegraph Co., 17 N.J. 149 (1954); 1 Scott, Trusts, § 12.2 (1939 ed.); Restatement, Trusts, § 12, comment g. While no one element is necessarily decisive in light of the almost numberless variety of factual situations, there are certain essential principles which taken in conjunction control or vitally influence the interpretation to be given."
In State v. Atlantic City Electric Co. the court held that the acceptance of deposits as security for the payment of customers' bills, without restriction as to the use of the deposits and without objection to commingling these deposits with general funds, the electric company obligating itself to pay 4% per annum on the deposits, created a relationship of debtor and creditor. (23 N.J., at p. 269.)
State v. Atlantic City Electric Co. stressed that the obligation on the part of the receiver of funds to pay interest thereon is "strongly persuasive that the intent was to create a debt rather than a fiduciary responsibility." (23 N.J., at p. 267.) But it also stated that the factor of interest was "not controlling," noting that other important determinatives were the receiver's right to commingle the funds with his own and to enjoy unrestricted use of the commingled fund.
The absence of any requirement to pay interest is far from conclusive evidence of a trust relationship and not necessarily determinative thereof. As stated in 1 Scott, Trusts (2d ed. 1956), sec. 12.2, pp. 108-109:
"Where there is no agreement for the payment of interest, other circumstances must be resorted to in order to determine whether a trust or a debt is created. The question in each case is whether it was intended that the person receiving the money should hold it for the benefit of another, or whether it was intended that he might use it as his own, being under a merely personal liability to pay *580 a similar amount of money. In the latter case a debt and not a trust is created."
We regard the main extension agreements before us as nothing more or less than business arrangements between the water companies and developers of land under the terms of which the water companies could become indebted for all or part of the money deposited. Without the compulsion of an order by the Public Utility Commission pursuant to R.S. 48:2-27, and unwilling to participate in the economic risk of the developer, the water companies and developers made these voluntary extension agreements to subserve their own respective business interests, and each party's rights against the other are limited by the terms of their contract.
As noted above, these contract terms conformed with the long-standing practice suggested by the Public Utility Commission. That surpluses, rather than deficits, resulted in favor of the water companies from these agreements does not destroy their validity. The incidence of a surplus in any such case merely effectuates the intent of the water companies not to be saddled with an uncompensated capital expenditure for a main extension beyond what is economically justified by annual revenue resulting therefrom.
And see the Board's new regulations promulgated on October 1, 1960, suggesting a refund formula of five times the estimated annual revenue from the extension, cited with approval by the Supreme Court, when they were only tentative proposals, in Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, 28 N.J. 423, 443 (1958).
We assessed the nature of the developer's request for an extension of the water main in Langan v. West Keansburg Water Co., 51 N.J. Super. 41, 52 (App. Div. 1958), as follows:
"The effect of Langan's application, in the light of the facts, is to ask the Water Company to take a speculative stake in the success of his development of the area, without any reasonable assurance *581 as to the amount of return it will receive for its investment or when, if ever, such a return will be realized."
In support of their argument that these moneys are trust funds, the State points out that the main extensions were to be at the absolute cost and expense of the water companies, and that the agreements used the verb "return" or "refund," rather than "repay." We find no substantial merit in this argument because it ignores the realities of the situation. Suppose a developer executed one of these agreements and made his deposit thereunder, thereby inducing the water company to extend its water main at considerable cost into his development to service a contemplated 100 new homes, and the developer erected a model home and only a few others and then abandoned the project. It would violate the contract rights of the water company and imperil its financial integrity to hold that such a developer is entitled to the full return of his deposit on the theory that it is trust money. Such was never intended by the parties.
We recognized that a developer might not get a full return of his deposit under the rules and regulations pertaining to cost allocations in service extension cases when we said in Petition of Highpoint Development Corp., 65 N.J. Super. 530, 537 (App. Div. 1961):
"The appellant [utility] is not required to extend its facilities unless it does so voluntarily, or when ordered by the Board. When it acts voluntarily it usually enters into a written contract with the prospective consumer; it requires a deposit to cover the estimated cost of installation; and refunds some portion, or all, of such deposit at the formula rate suggested by the Board. The Board's rules and regulations attempt not only to protect the utility's capital investment and keep it out of the real estate development business, but in instances where the agreement provides for a refund of the deposit to set up a suggested formula for such refund." (Emphasis ours)
The ten-year provision in the extension agreements, as sanctioned by the Public Utility Commission, is an obvious *582 recognition by the parties that the full deposit may not be returned and that any part of the deposit not refundable to the depositor within that time becomes the property of the water company. This provision in the contract was part of the consideration which persuaded the water company to risk investment of its capital in a venture which it might otherwise choose to avoid because of its speculative character. Such a clear expression of contractual intent refutes the State's claim of a trust and must be respected.
The Type C extension agreement, without the ten-year limitation for obtaining a refund, does not alter the basic contract rights of the parties or change their status from debtor and creditor to that of trustee and beneficiary. The right to a refund still depends upon the formula expressed in the contract. Thus, when any part of the deposit becomes refundable under that formula by the connection of a house to the main extension, the water company becomes indebted to the depositor to that extent only.
Nor do we find in the agreements any ambiguity sufficient to bring into play the doctrine of contra proferentem. Meehan v. Kaveny Bros. Oil Co., 27 N.J. Super. 547, 553 (App. Div. 1953). If the contracts produce any forfeiture of a depositor's money, as contended by the State, it is a lawful, conscionable forfeiture growing out of a valid contract and constituting a legal quid pro quo for the construction and continued maintenance by the water companies of the extended water mains. Such a bargain was authorized by the rules and regulations of the State's administrative agency which supervises the activities of public utilities.
Having concluded that the main extension agreements created no more than a debtor and creditor relationship, it follows that the application of the statute of limitations by the trial courts was proper. The main extension agreements were not under seal, so that the six-year statute of limitations, N.J.S. 2A:14-1, would normally apply. However, even though the State's right under the Custodial Escheat Act is derivative, our Supreme Court ruled in State *583 by Parsons v. United States Steel Corp., supra, that a failure to report escheatable property to the State, as admitted in this case, estops the debtor from the defense of the statute of limitations for six years prior to July 13, 1951, the effective date of the Custodial Escheat Act. See, too, State by Parsons v. Standard Oil Co., supra; State by Richman v. Sperry & Hutchinson Co., 23 N.J. 38, 43-44 (1956); and State v. Union Bag-Camp Paper Corp., 35 N.J. 390 (1961).

II.
On their cross-appeals the defendant water companies, in contending that they should not be so estopped, rely essentially upon the dissenting opinion in State by Parsons v. United States Steel Corp., supra, 22 N.J., at p. 361. However, we are controlled by the majority opinion in that case. Hence, we find no merit in the cross-appeals.
Elizabethtown included in its notice of appeal the award of custody of the $25 due on the 1927 bond coupon. But it did not advance any reason in its brief or at oral argument as to why the trial court's determination that this sum was being held in trust and not subject to the statute of limitations should be disturbed. We find, therefore, no basis for reversal as to this item and affirm the conclusion with reference thereto.
Finding no prejudicial error, the judgments under review are in all respects affirmed.