696 A.2d 709

SOUTH JERSEY CATHOLIC SCHOOL TEACHERS ORGANIZA-
TION, AN UNINCORPORATED LABOR ORGANIZATION,
PLAINTIFF–RESPONDENT, v. ST. TERESA OF THE INFANT
JESUS CHURCH ELEMENTARY SCHOOL, SAINT BARTHOLO-
MEW CHURCH ELEMENTARY SCHOOL, THE CHURCH OF
SAINT JUDE ELEMENTARY SCHOOL, SAINT JOSEPH PRO-
CATHEDRAL CHURCH ELEMENTARY SCHOOL, SAINT JO-
SEPH CHURCH ELEMENTARY SCHOOL AND SACRED
HEART CHURCH ELEMENTARY SCHOOL, DEFENDANTS–
APPELLANTS.

Argued March 18, 1997—Decided July 24, 1997.

576

578

*James A. Serritella,* a member of the Illinois bar, and *Martin F. McKernan, Jr.,* argued the cause for appellants (*McKernan, McKernan & Godino,* attorneys; *Mr. Serritella, Mr. McKernan, James J. Godino, Jr., Francis J. Monari, Christopher G. Martucci, James C. Geoly,* a member of the Illinois bar and *W. Cole Durham, Jr.,* a member of the Utah bar, of counsel and on the briefs).

*Benjamin Eisner* argued the cause for respondent (*Spear, Wilderman, Borish, Endy, Spear* and *Runckel,* attorneys).

*James Katz* argued the cause for amicus curiae, American Civil Liberties Union of New Jersey (*Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano,* attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

The issue raised in this appeal is whether lay teachers in church-operated elementary schools have an enforceable state constitutional right to unionize and to engage in collective bargaining respecting secular terms and conditions of employment without violating the Religion Clauses of the First Amendment of the United States Constitution. Plaintiff asserts that it was elected the majority representative of the lay teachers employed by defendants. The trial court refused to compel defendants to recognize and to bargain with plaintiff as the labor representative of the lay teachers on the ground that to do so would violate the Free Exercise and Establishment Clauses of the First Amendment. The Appellate Division reversed in a published opinion. 290 *N.J.Super.* 359, 675 *A.*2d 1155 (1996). We granted defendants' petition for certification. 146 *N.J.* 567, 683 *A.*2d 1162 (1996).

We now affirm and hold that the lay elementary-school teachers have a state constitutional right to unionize and to engage in collective bargaining. The scope of that negotiation, however, is limited by the Religion Clauses of the First Amendment to wages, certain benefit plans, and any other secular terms or conditions of employment similar to those that are currently negotiable under an existing agreement with high school lay teachers employed by the Diocese of Camden.

I

Defendants are elementary schools operated by the Catholic Diocese of Camden. Each of the church-operated schools employs a sizeable number of lay teachers. Plaintiff, a lay teacher organi-

zation, asserts that it was elected by a majority of the lay teachers employed in each defendant school. When plaintiff sought to have defendants recognize it as the collective-bargaining representative of the lay teachers, a Board of Pastors, acting on behalf of defendants, informed plaintiff that it would be recognized only if it signed a document entitled "Minimum Standards for Organizations Wishing to Represent Lay Teachers in a Parish or Regional Catholic Elementary School in the Diocese of Camden" ("Minimum Standards"). Plaintiff was informed that the Minimum Standards were not negotiable. That document, among other things, vests in the Board of Pastors complete and final authority to dictate the outcome of any dispute; it also prohibits plaintiff from assessing dues or collecting agency fees from non-union members.

Plaintiff refused to accept the Minimum Standards, claiming that to do so would have amounted to bargaining away a number of lay teacher rights prior to certification of the union and before the collective-bargaining process had commenced. Defendants accordingly refused to recognize plaintiff or to bargain collectively. Plaintiff then instituted the present litigation to compel defendants to recognize it as the collective-bargaining representative of the lay teachers and to compel defendants to engage in collective bargaining respecting the terms and conditions of employment Plaintiff maintained that the lay teachers are private employees and sought relief based on Article I, Paragraph 19 of the New Jersey Constitution. It provides:

> Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.

> [*N.J. Const.* art. I, ¶ 19.]

The trial court granted summary judgment dismissing the complaint. It concluded that granting the relief sought by plaintiff would interfere with defendants' free exercise of religion and

would involve an excessive entanglement between the State and the Catholic Church.

The Appellate Division found that the present case involves only a Free Exercise Clause claim rather than an Establishment Clause claim or both. Relying on the right to organize and bargain collectively established by the New Jersey Constitution, the court concluded that there is a compelling state interest in permitting plaintiff to organize and to engage in collective bargaining that outweighs the claimed burden on defendants' free exercise rights. That compelling state interest was identified as "the preservation of industrial peace and a sound economic order." 290 *N.J.Super.* at 389, 675 *A.*2d 1155 (internal quotation marks omitted). It also found that distinctions between the levels of religious indoctrination that occur in elementary and high schools are not controlling in the present case given that the Diocese of Camden has bargained collectively over secular terms and conditions of employment in the high schools for a number of years.

## II

Defendants argue that the decision in *NLRB v. Catholic Bishop,* 440 *U.S.* 490, 99 *S.Ct.* 1313, 59 *L.Ed.*2d 533 (1979), deprived the state courts of subject matter jurisdiction and dictates that defendants cannot be compelled to recognize the union and to engage in collective bargaining without violating the Religion Clauses because the controversy involves a labor and management dispute that is controlled by the National Labor Relations Act ("NLRA"), 29 *U.S.C.A.* §§ 151–169. States are preempted from acting on matters subject to the NLRA unless the National Labor Relations Board ("NLRB") has declined, or would decline, to assert jurisdiction. *Lay Faculty Ass'n v. Roman Catholic Archdiocese,* 122 *N.J.Super.* 260, 269, 300 *A.*2d 173 (App.Div.1973). Although the United States Supreme Court in *Catholic Bishop* concluded that Congress did not intend that cases addressing whether lay teachers in church-operated schools have a right to unionize and to engage in collective bargaining be covered

by the NLRA, *Catholic Bishop, supra,* 440 *U.S.* at 504–07, 99 *S.Ct.* at 1320–22, 59 *L.Ed.*2d at 543–45, defendants nonetheless maintain that the Appellate Division should be reversed for failing to follow the Supreme Court's decision in *Catholic Bishop.*

Plaintiff and the American Civil Liberties Union ("ACLU"), appearing as *amicus curiae,* respond that defendants have misinterpreted *Catholic Bishop.* Plaintiff and the ACLU maintain that (1) our courts may exercise subject matter jurisdiction over the present case; and (2) defendants may be compelled to recognize the union and to bargain collectively. The ACLU also asserts that *Catholic Bishop* "justifies the application of [Article I, Paragraph 19]" in the present case.

Defendants' reliance on *Catholic Bishop* is misplaced. That case was decided strictly on statutory interpretation grounds. The Court ruled that in the absence of "an 'affirmative intention of the Congress clearly expressed' " that teachers in church-operated schools should be covered by the NLRA, the NLRB did not have jurisdiction to "require church-operated schools to grant recognition to unions as bargaining agents for their teachers." *Id.* at 506, 99 *S.Ct.* at 1322, 59 *L.Ed.*2d at 545. The Court avoided the constitutional claims that were asserted. Even if the issues under the Religion Clauses had been reached, the present case is distinguishable from a case involving the NLRA. The regulatory scheme under the NLRA requires the NLRB to act as monitor-referee, thus causing much more entanglement of government with religion than does Article I, Paragraph 19 of the New Jersey Constitution. The NLRB maintains ongoing regulatory authority over parties engaged in collective bargaining, exercising investigatory, prosecutorial, and adjudicatory authority. 29 *U.S.C.A.* §§ 158–161. In the present case, there is no "leviathan-like governmental regulatory board" to monitor the parties' negotiations. 290 *N.J.Super.* at 391, 675 *A.*2d 1155.

When, as in the present case, the subject matter of a case falls outside the scope of the NLRA, "state tribunals are free to exercise jurisdiction over the subject matter." *Cooper v. Nutley*

*Sun Printing Co.*, 36 *N.J.* 189, 194, 175 *A.*2d 639 (1961); *see also Christ the King Reg'l High School v. Culvert*, 815 *F.*2d 219, 222–23 (2d Cir.1987). Article I, Paragraph 19 was intended to protect workers who are not covered by the NLRA. *George Harms Constr. Co. v. New Jersey Turnpike Auth.*, 137 *N.J.* 8, 28, 644 *A.*2d 76 (1994); Richard A. Goldberg & Robert F. Williams, *Farmworkers' Organizational and Collective Bargaining Rights in New Jersey: Implementing Self–Executing State Constitutional Rights*, 18 *Rutgers L.J.* 729, 742 (1987). The right of private employees to organize and to bargain collectively is so important that it has been elevated to constitutional status and is regarded as a fundamental right. *George Harms, supra*, 137 *N.J.* at 28–29, 644 *A.*2d 76; *Lullo v. International Ass'n of Fire Fighters, Local 1066*, 55 *N.J.* 409, 415, 262 *A.*2d 681 (1970). In the absence of preemption, we must decide whether enforcement of the fundamental right of the lay teachers to organize and to bargain collectively conflicts with the Religion Clauses.

## III

Defendants argue that requiring the Diocese to bargain collectively with plaintiff would inhibit religion and would excessively entangle the State in religious affairs in violation of the Establishment Clause. Plaintiff and the ACLU maintain that such a requirement would not violate the Establishment Clause. As noted earlier, the Appellate Division was not persuaded that the present case implicates the Establishment Clause; the court concluded that only the Free Exercise Clause is at issue. The court reasoned that " '[g]overnment support for religion is an element of every establishment claim, just as a burden or restriction on religion is an element of every free exercise claim.' " 290 *N.J.Super.* at 379, 675 *A.*2d 1155 (quoting Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 *Colum. L.Rev.* 1373, 1394 (1981)). The Appellate Division stressed that the present case involves "the uniform application of a state

constitutional provision," and concluded that the application of Article I, Paragraph 19 to parochial schools does not constitute an establishment of religion. 290 *N.J.Super.* at 379–80, 675 *A.*2d 1155.

However, in many instances, "claims under the Establishment Clause and the Free Exercise Clause involve the same considerations and are not easily divided and put into separate pigeon holes." *Catholic High School Ass'n of the Archdiocese v. Culvert,* 753 *F.*2d 1161, 1166 (2d Cir.1985). The Religion Clauses of the United States Constitution provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *U.S. Const.* amend I. The New Jersey Constitution also contains a Religion Clause: "There shall be no establishment of one religious sect in preference to another." *N.J. Const.* art. I, ¶ 4. Under both constitutions, the State and all instrumentalities of the State are prohibited from showing a preference for one religion over another because to do so would violate the establishment prong of the Religion Clauses. *Tudor v. Board of Educ.,* 14 *N.J.* 31, 44, 100 *A.*2d 857 (1953).

Because the First Amendment has been made applicable to the states by the Fourteenth Amendment of the United States Constitution, *Cantwell v. Connecticut,* 310 *U.S.* 296, 303, 60 *S.Ct.* 900, 903, 84 *L.Ed.* 1213, 1218 (1940), and because our State Religion Clause is literally less pervasive than the First Amendment, our discussions of the Religion Clauses will be limited to the federal provisions. *Clayton v. Kervick,* 56 *N.J.* 523, 528, 267 *A.*2d 503 (1970), *vacated on other grounds sub nom. Levine v. Clayton,* 403 *U.S.* 945, 91 *S.Ct.* 2275, 29 *L.Ed.*2d 854 (1971). As the federal jurisprudence concerning the Religion Clauses now stands, there is no need to consider whether our State Constitution affords greater religious protection than that afforded by the First Amendment.

Half a century after the majority, concurring, and dissenting opinions were issued in *Everson v. Board of Education,* 330 *U.S.* 1, 67 *S.Ct.* 504, 91 *L.Ed.* 711 (1947), the debate continues over the

dimensions of the "wall of separation" between church and state that the framers of the First Amendment Religion Clauses intended to erect. The present case perpetuates that old debate and raises the additional issue whether the dispute between plaintiff and defendants should be analyzed under the Establishment Clause, the Free Exercise Clause, or both. A major crack occurred in the "wall of separation" on June 23, 1997, when the United States Supreme Court decided *Agostini v. Felton,* — *U.S.* ——, 117 *S.Ct.* 1997, 138 *L.Ed.*2d 391 (1997). The Court overruled *Aguilar v. Felton,* 473 *U.S.* 402, 105 *S.Ct.* 3232, 87 *L. Ed.*2d 290 (1985), and held that New York City's program that sent public school teachers into parochial schools to provide remedial education to disadvantaged students pursuant to Title I of the Elementary and Secondary Education Act of 1965, 20 *U.S.C.A.* §§ 6301–6514, did not involve an excessive entanglement of church and state and therefore was not violative of the Establishment Clause. *Agostini, supra,* — *U.S.* at —— ———, 117 *S.Ct.* at 2015–17, 138 *L.Ed.*2d at 420–22.

■ There are cases in which the Establishment and Free Exercise Clauses should be analyzed jointly because "there has been some blurring of sharply honed differentiations" between those clauses. *Catholic Bishop v. NLRB,* 559 *F.*2d 1112, 1131 (7th Cir.1977), *aff'd on other grounds,* 440 *U.S.* 490, 99 *S.Ct.* 1313, 59 *L. Ed.*2d 533 (1979). Excessive entanglement of government with religion may be viewed both as government's sponsorship of religion and as its interference with the free exercise of religion. It must also be considered as a factor separate and apart from the effect of governmental action. *Agostini, supra,* — *U.S.* at —— ———, 117 *S.Ct.* at 2014–15, 138 *L.Ed.*2d at 419–20. As will be seen later, it is excessive entanglement that burdens the free exercise of religion and may, under certain circumstances trigger application of the compelling state interest standard under a Free Exercise Clause analysis. For those reasons we will analyze the present case under both of the Religion Clauses. Inquiries under both clauses are extremely fact sensitive.

## IV

First, we consider the claims under the Establishment Clause. In *Everson, supra*, 330 *U.S.* 1, 67 *S.Ct.* 504, 91 *L.Ed.* 711, Justice Black, in his opinion for the majority of the Court, explained the meaning of the Establishment Clause:

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.

> .    .    .    .    .    .    .    .

> That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers.
>
> [*Id.* at 15, 18, 67 *S.Ct.* at 511, 513, 91 *L.Ed.* at 723, 724–25.]

■  The standard for conducting an Establishment Clause analysis is a three-pronged test that was articulated in *Lemon v. Kurtzman*, 403 *U.S.* 602, 612–13, 91 *S.Ct.* 2105, 2111, 29 *L.Ed.*2d 745, 755 (1971). Those elements are: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Ibid.* (citations omitted); *see also New Jersey State Bd. of Higher Educ. v. Board of Dirs. of Shelton College*, 90 *N.J.* 470, 487, 448 *A.*2d 988 (1982).

■  For purposes of this appeal, the parties concede that Article I, Paragraph 19 of the New Jersey Constitution satisfies the first prong because it has the secular purpose of advancing the economic welfare of private-sector employees by establishing the right of private parties to organize and to bargain collectively. Defendants argue, however, that the second prong is implicated in this case because Article I, Paragraph 19 infringes upon their right to govern their educational process, thereby inhibiting religion. Although standing alone that argument sounds more like a free exercise claim, we will address it under the Establishment Clause.

We are persuaded that the primary effect of that state constitutional provision is not to inhibit religion, but rather to require a private employer to enter into collective bargaining with the elected representative of its employees. *See Culvert, supra,* 753 *F.*2d at 1166 (acknowledging that only third prong was in dispute to determine whether state labor relations board could exercise jurisdiction with respect to parochial high schools and their lay teachers); *see also Hill–Murray Fed'n of Teachers v. Hill–Murray High School,* 487 *N.W.*2d 857, 863 (Minn.1992) (stating that there was "no dispute that only the third prong is potentially implicated" by applying that state's labor relations act to the respondent high school's labor relations).

The Diocese's past history of collective bargaining with lay high-school teachers strongly suggests that bargaining over some secular terms and conditions of employment can be achieved without either advancing or inhibiting religion. Since 1984, defendants and plaintiff have negotiated a series of collective bargaining agreements concerning the lay high-school teachers employed by the Diocese of Camden. Significant provisions of the most recent agreement include:

A. The Organization is hereby recognized by the Diocese as the sole and exclusive collective bargaining agent for the following lay employees at diocesan sponsored secondary schools:

1. All full-time classroom teachers;
2. All full-time guidance counselors;
3. All full-time nurses and librarians;
4. All full-time special education teachers within the diocese;

. . . . . . . .

Excluding all others including:

1. All principals, all vice principals appointed by the Bishop of the Diocese, and all deans of students.

. . . . . . . .

B. The subjects covered by this Agreement are wages, benefits and other terms and conditions of employment.

C. Excluded from the scope of negotiations are the following:

1. Decisions involving educational policies and/or ecclesiastical considerations involving religious-moral qualifications.

2. The administrator's right to assign, supervise, discipline and demand responsible teacher accountability in all curricular and extra curricular areas.

3. The school ratio.

. . . . . . . .

F. . . . [N]othing in the agreement shall be considered as interfering in any way with the function and duties of the Diocese insofar as they are canonical or religious.

\*  \*  \*  \*  \*  \*  \*  \*

I. The Organization recognizes the sole right and duty of the Bishop of the Diocese functioning through the Diocese to see that the schools are operated in accordance with the philosophy of Catholic education, the doctrine, the teachings, the laws and norms of the Catholic Church.

\*  \*  \*  \*  \*  \*  \*  \*

K. The right to hire, suspend, discharge or otherwise discipline a teacher for violation of such rules or for other proper and just cause is reserved to the Diocese.

L. The Diocese retains the sole right to operate the school system and nothing shall be deemed to limit or restrict it in any way in the exercise of all its functions in management operations. This includes the right to make such rules relating to its operation as it shall deem advisable providing they are not inconsistent with the terms of the agreement.

Article XI of the agreement outlines the benefits referred to in Article I, Paragraph B. Those benefits include medical insurance, dental insurance, a prescription drug plan, life insurance, and other common benefits. The medical benefits are further described in a plan summary and are limited to individual and family coverage. No litigation has arisen out of the agreements between the lay high-school teachers and the Diocese since the first agreement was executed in 1984.

Indeed, the agreement between the Diocese and the elected representative for the lay high-school teachers preserves the Bishop's exclusive right to structure the schools and their philosophies. Thus, bargaining collectively over similar secular terms and conditions of employment for lay elementary-school teachers would not inhibit defendants' religion by interfering with issues of structure and indoctrination.

The significant issue is whether requiring collective bargaining will involve or create excessive entanglement between the State

and religion. When deciding whether the excessive governmental entanglement with religion prong has or will be violated, it must be remembered that such a determination properly

"rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *People of Illinois ex rel. McCollum v. Board of Educ.,* 333 *U.S.* 203, 212, 68 *S.Ct.* 461, 465, 92 *L.Ed.* 649, 659 (1948). This prong most closely connects the *Lemon* test to Jefferson's notion of a "wall of separation" between church and state. *See Reynolds v. United States,* 98 *U.S.* 145, 164, 25 *L.Ed.* 244, 249 (1878) (quoting reply from Thomas Jefferson to the Danbury Baptist Association, Jan. 1, 1802). The Supreme Court has stated, "Some limited and incidental entanglement between church and state authority is inevitable in a complex modern society, ... but the concept of a 'wall' of separation is a useful signpost." *Larkin v. Grendel's Den, Inc.,* 459 *U.S.* 116, 123, 103 *S.Ct.* 505, 510, 74 *L.Ed.*2d 297, 305 (1982). [*Ran–Dav's County Kosher, Inc. v. State,* 129 *N.J.* 141, 154, 608 *A.*2d 1353 (1992).]

◼ Although the "wall of separation" is a useful signpost, the *Lemon* Court recognized that the prohibition of the state's entanglement in religion does not mean an absolute separation between Church and State. *Lemon* proscribes only " 'excessive government entanglement with religion,' " *Lemon, supra,* 403 *U.S.* at 613, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 755; it does not erect an impenetrable wall of separation. The Court reaffirmed that notion recently when it stated that "[n]ot all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two. Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini, supra,* —— *U.S.* at ——, 117 *S.Ct.* at 2015, 138 *L.Ed.*2d at 420 (citation omitted).

We are aware that generally, "church-related elementary and secondary schools have a significant religious mission[,] and ... a substantial portion of their activities is religiously oriented." *Lemon, supra,* 403 *U.S.* at 613, 91 *S.Ct.* at 2111, 29 *L.Ed.*2d at 756. In addition, "[t]he various characteristics of the schools make them a powerful vehicle for transmitting the Catholic faith to the next generation. This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in

primary schools particularly." *Id.* at 616, 91 *S.Ct.* at 2113, 29 *L.Ed.*2d at 757 (internal quotation marks omitted).

■ But the agreement between the high schools and their lay teachers demonstrates that there are some secular terms such as wages and benefit plans that the Diocese can negotiate while preserving its complete and final authority over religious matters. In that context, the distinction, in terms of impressionability, between high school students and elementary school students is not constitutionally significant.

■ By limiting the scope of collective bargaining to secular issues such as wages and benefit plans, neutral criteria are used to insure that religion is neither advanced nor inhibited. We also perceive that the extent of the State's involvement would be minimal at most. Only excessive entanglement is proscribed and no continued state surveillance is anticipated in the present case. *Id.* at 619, 91 *S.Ct.* at 2114, 29 *L.Ed.*2d at 759–60; *Resnick v. East Brunswick Township Bd. of Educ.*, 77 *N.J.* 88, 115–16, 389 *A.*2d 944 (1978). A policy under which continual entanglement between the government and religion can be anticipated would "verge on government sponsorship of religion," *Resnick, supra,* 77 *N.J.* at 115, 389 *A.*2d 944, and would therefore be violative of the Establishment Clause. Compelling collective bargaining over such secular terms as wages and benefits pursuant to Article I, Paragraph 19 of the New Jersey Constitution "does not include the potential for the state [either] to mandate religious beliefs [ ]or . . . [to] force the parties to agree to specific terms." *Hill–Murray, supra,* 487 *N.W.*2d at 864. Moreover, "[i]t is a fundamental tenet of the regulation of collective bargaining that government brings private parties to the bargaining table and then leaves them alone to work through their problems." *Culvert, supra,* 753 *F.*2d at 1167.

In the present case, the State would require only that the Diocese recognize the lay teachers' right to bargain collectively over wages, benefits, and any other terms and conditions required by the agreement with the lay high-school teachers. The State would not force the Diocese to negotiate terms that would affect

religious matters. The State would not dictate which additional terms must be negotiated, nor would it decide the specific terms of the parties' ultimate agreement. Viewed in that limited context, we are satisfied that this case does not involve the type of "comprehensive, discriminating, and continuing state surveillance," required, for instance, by the statute in *Lemon* that provided for state financial aid to nonpublic elementary schools for only secular subjects. *Lemon, supra,* 403 *U.S.* at 619, 91 *S.Ct.* at 2114, 29 *L.Ed.*2d at 759. Thus, we hold that requiring defendant to bargain collectively with plaintiff over the same terms and conditions as are negotiable under the high school agreement does not violate the Establishment Clause.

## V

We now turn to defendants' claim that requiring them to bargain collectively with the lay teachers violates the Free Exercise Clause.[1] Defendants seek a religiously based exemption from our state constitutional requirements. They argue that mandating collective bargaining in catholic parish schools would threaten the autonomy of church bodies and would infringe impermissibly upon the relationship with the ministerial employees. Plaintiff and the ACLU disagree.

Unlike an Establishment Clause violation, an infringement of the Free Exercise Clause is based on coercion. *School Dist. v. Schempp,* 374 *U.S.* 203, 223, 83 *S.Ct.* 1560, 1572, 10 *L.Ed.*2d 844, 858 (1963). In the present case, defendants maintain that they are being forced to recognize the union and to engage in collective bargaining. The purpose of the Free Exercise Clause "is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Ibid.* Like the rights protected by the Establishment Clause, free exercise rights are not absolute.

---

[1] For a discussion of the historical development of the Free Exercise Clause, see Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 *Harv. L.Rev.* 1409 (1990).

"[R]eligious institutions do not enjoy an absolute immunity from worldly burdens." *Market St. Mission v. Bureau of Rooming and Boarding House Standards*, 110 *N.J.* 335, 340, 541 *A.*2d 668 (1988); *see also Elmora Hebrew Ctr., Inc. v. Fishman*, 125 *N.J.* 404, 413–14, 593 *A.*2d 725 (1991).

Even when governmental action has a coercive effect on the free exercise of religion, it must be determined whether the impact is on beliefs or conduct. The Free Exercise Clause embraces both the "freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell, supra,* 310 *U.S.* at 303–04, 60 *S.Ct.* at 903, 84 *L.Ed.* at 1218 (footnote omitted); *see also Bowen v. Roy,* 476 *U.S.* 693, 699, 106 *S.Ct.* 2147, 2152, 90 *L. Ed.*2d 735, 744 (1986); *Reynolds v. United States,* 98 *U.S.* 145, 166, 25 *L.Ed.* 244, 250 (1878).

To determine whether the government has coercively interfered with a religious belief, or has impermissibly burdened a religious practice, the so-called *Sherbert/Yoder* test was established. That test was subsequently modified by case law and the Congress of the United States. We generally agree with the Appellate Division's analysis of that evolving modern standard:

> In *Sherbert v. Verner,* 374 *U.S.* 398, 403, 83 *S.Ct.* 1790, 1793, 10 *L.Ed.*2d 965, 970 (1963), the Court held that any incidental burden on the free exercise of religion may be justified only by a compelling state interest in the regulation of a subject that is within the State's constitutional power to regulate. "[I]n this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" 374 *U.S.* at 406, 83 *S.Ct.* at 1795, 10 *L.Ed.*2d at 972 (quoting *Thomas v. Collins,* 323 *U.S.* 516, 530, 65 *S.Ct.* 315, 323, 89 *L.Ed.* 430, 440 (1945)). In *Wisconsin v. Yoder,* 406 *U.S.* 205, 92 *S.Ct.* 1526, 32 *L.Ed.*2d 15 (1972), the Court reiterated this test, and added:
>
>> But to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability....

A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for government neutrality if it unduly burdens the free exercise of religion.

[406 *U.S.* at 220, 92 *S.Ct.* at 1536, 32 *L.Ed.*2d at 28.]

When faced with such a claim, we must closely examine the interests the State seeks to promote and the impediments to those objectives that would flow from recognizing an exemption from a generally applicable law. *Yoder, supra,* 406 *U.S.* at 221, 92 *S.Ct.* at 1536, 32 *L.Ed.*2d at 28. The *Sherbert/Yoder* test is at bottom a balancing test requiring consideration of whether: (1) the claims presented were religious in nature and not secular; (2) the state action burdened the religious exercise; and (3) the state interest was sufficiently compelling to override the constitutional right of free exercise of religion. *Culvert, supra,* 753 *F.*2d at 1169.

In *Employment Div. v. Smith,* 494 *U.S.* 872, 885, 110 *S.Ct.* 1595, 1603, 108 *L.Ed.*2d 876, 889 (1990), the Court discarded the *Sherbert/Yoder* approach to free exercise challenges. *See Diaz v. Collins,* 872 *F.Supp.* 353 (E.D.Tex.1994) (recognizing abrogation of *Yoder*). In its place, the Court held that a generally applicable and otherwise valid regulatory law which is not specifically intended to regulate religious conduct or belief and which incidentally burdens the free exercise of religion does not violate the Free Exercise Clause of the First Amendment. 494 *U.S.* at 878, 110 *S.Ct.* at 1599–1600, 108 *L.Ed.*2d at 885. The Court retained the compelling interest test for instances where the regulatory law impacts the Free Exercise Clause in conjunction with another constitutional protection, such as freedom of speech and of the press, or the right of parents to direct the education of their children. 494 *U.S.* at 881–82, 110 *S.Ct.* at 1601–02, 108 *L.Ed.*2d at 887–88.

In response to the *Smith* decision, the Religious Freedom Restoration Act (RFRA), 42 *U.S.C.A.* § 2000bb, was adopted in November 1993. Its stated purpose was to restore the compelling interest test set forth in *Sherbert* and *Yoder,* and to guarantee its application in all cases where free exercise was substantially burdened by otherwise neutral laws. 42 *U.S.C.A.* § 2000bb(a) and (b). RFRA further provides in pertinent part:

(a) In general.—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception.—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

[42 *U.S.C.A.* § 2000bb–1.]

RFRA is applicable to all federal and state law, whether statutory or otherwise, and whether adopted before or after the enactment of the Act. 42 *U.S.C.A.* § 2000b–3(a).

[290 *N.J.Super.* at 380–81, 675 *A.*2d 1155.]

Although cases from other jurisdictions have highlighted some confusion that has existed, before and after the enactment of RFRA, regarding "incidental" and "substantial" burdens on the free exercise of religion, distilled to essentials, the RFRA test permits a state to burden the free exercise of religion if the burden imposed is in furtherance of a compelling state interest and represents the least restrictive means of furthering that compelling state interest. The distinction between "incidental" and "substantial" burdens on the right to free exercise is not dispositive. The Appellate Division concluded that "[r]egardless of whether the burden is substantial or incidental, there still must be a determination of whether the State's interest is compelling." *Id.* at 383, 675 *A.*2d 1155.

The Appellate Division rejected a constitutional challenge to RFRA and decided the case based on that standard. The court concluded that (1) Article I, Paragraph 19 is a neutral, generally applicable civil law; (2) a compelling state interest was advanced by that law; and (3) the least restrictive means of furthering the State's interest were used by limiting the issues subject to collective bargaining.

A few days ago the United States Supreme Court held that RFRA is unconstitutional. *City of Boerne v. Flores,* —— *U.S.* ——, 117 *S.Ct.* 2157, 138 *L.Ed.*2d 624 (1997). The Court reasoned that RFRA is a substantive law and under the Enforcement Clause of the Fourteenth Amendment, *U.S. Const.* amend XIV, § 5, Congress has the power to pass only remedial or preventative legislation. *Flores, supra,* —— *U.S.* at —— -- ——, 117 *S.Ct.* at 2171–72, 138 *L.Ed.*2d at 647–49.

When overturning RFRA, the Court made some observations that are instructive on whether the *Smith* standard has been reestablished:

> Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law. If " 'compelling interest' really means what it says ... many laws will not meet the test.... [The test] would open the prospect of constitutionally required religious exemptions from civic obligations of almost

every conceivable kind." [*Smith, supra,* 494 *U.S.,*] at 888, 110 *S.Ct.,* at 1605. Laws valid under Smith would fall under RFRA without regard to whether they had the object of stifling or punishing free exercise. We make these observations not to reargue the position of the majority in Smith but to illustrate the substantive alteration of its holding attempted by RFRA. Even assuming RFRA would be interpreted in effect to mandate some lesser test, say one equivalent to intermediate scrutiny, the statute nevertheless would require searching judicial scrutiny of state law with the attendant likelihood of invalidation. This is a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens.

The substantial costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional general regulatory power, far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in Smith. Simply put, RFRA is not designed to identify and counteract state laws likely to be unconstitutional because of their treatment of religion.... RFRA's substantial burden test ... is not even a discriminatory effects or disparate impact test. It is a reality of the modern regulatory state that numerous state laws, such as the zoning regulations at issue here, impose a substantial burden on a large class of individuals. When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs. In addition, the Act imposes in every case a least restrictive means requirement—a requirement that was not used in the pre-Smith jurisprudence RFRA purported to codify—which also indicates that the legislation is broader than is appropriate if the goal is to prevent and remedy constitutional violations.

[*Flores, supra,* —— *U.S.* at ——, 117 *S.Ct.* at 2171, 138 *L.Ed.*2d at 647.]

■ We will, therefore, apply the *Smith* standard in deciding whether the Free Exercise Clause has been violated. Under *Smith* the compelling state interest requirement does not apply unless the regulatory law impacts the Free Exercise Clause *and* some other constitutional protection, such as freedom of speech or freedom of the press. Nor does the *Smith* standard apply the *Sherbert* balancing test, which asks whether the law at issue substantially burdens a religious practice and, if so, whether the burden is justified by a compelling government interest.

■ It is beyond dispute that Article I, Paragraph 19 is a generally applicable civil law. It is also neutral in that it is not intended to regulate religious conduct or belief. Instead, it is intended to enhance the economic welfare of private-sector employees. Because the state constitutional provision is neutral and

of general application, the fact that it incidentally burdens the free exercise of religion does not violate the Free Exercise Clause. *Smith, supra,* 494 *U.S.* at 878–79, 110 *S.Ct.* at 1600, 108 *L.Ed.*2d at 885–86.

■ Defendants have proffered a hybrid argument in their briefs stating that to require them to recognize the union and to engage in collective bargaining would violate both the Free Exercise Clause and their First Amendment right to free association. *Id.* at 881–82, 110 *S.Ct.* at 1601–02, 108 *L.Ed.*2d at 887–88 (holding that neutral, generally applicable law must implicate some other constitutional right in addition to Free Exercise Clause before compelling state interest standard applies). Defendants, however, have not presented any argument in their briefs to support that claim. Issues that are raised but are not supported with arguments are deemed waived. *See, e.g., 500 Columbia Turnpike Assocs. v. Haselmann,* 275 *N.J.Super.* 166, 172, 645 *A.*2d 1210 (App.Div.1994) (dismissing aspects of cross-appeal that were not supported by any argument in brief); *Kerney v. Kerney,* 81 *N.J.Super.* 278, 282, 195 *A.*2d 476 (App.Div.1963) (appeal dismissed because appellants' brief contained no argument in support of the grounds raised in their notice of appeal); *State v. Plainfield–Union Water Co.,* 75 *N.J.Super.* 571, 583, 183 *A.*2d 684 (App.Div.1962) (resolving issue raised in notice of appeal, but not advancing any reasoning to support assertion, against appellant), *aff'd sub nom. State v. Elizabethtown Water Co.,* 40 *N.J.* 280, 191 *A.*2d 457 (1963).

■ We have nonetheless considered the merits of the issue and conclude that employers do not have a constitutional right not to associate when employees' right to organize would be jeopardized. *Texas & New Orleans R.R. Co. v. Brotherhood of Railway & Steamship Clerks,* 281 *U.S.* 548, 571, 50 *S.Ct.* 427, 434, 74 *L.Ed.* 1034, 1046 (1930) (finding provision in Railway Labor Act stating that employees' right to designate representatives without interference, influence, or coercion did not violate employer's right to freedom of association); *NLRB v. Field & Sons, Inc.,* 462 *F.*2d

748, 750 (1st Cir.1972) (finding that employer could not withdraw from multi-employer association and stating that "individual employer's freedom of association must ... be sacrificed"); *Fort Wayne Patrolmen's Benevolent Ass'n, Inc. v. City of Fort Wayne,* 625 *F.Supp.* 722, 728 (N.D.Ind.1986) (finding that freedom of association does not apply to employer-employee relationships); *cf. New York State Club Ass'n v. City of New York,* 487 *U.S.* 1, 13–14, 108 *S.Ct.* 2225, 2234, 101 *L.Ed.*2d 1, 16 (1988) (holding that generally applicable anti-discrimination law affecting places of public accommodation did not violate club members' First Amendment freedom of association rights); *Board of Dirs. of Rotary Int'l v. Rotary Club,* 481 *U.S.* 537, 548–49, 107 *S.Ct.* 1940, 1947–48, 95 *L.Ed.*2d 474, 486–87 (1987) (same); *Roberts v. United States Jaycees,* 468 *U.S.* 609, 621–23, 104 *S.Ct.* 3244, 3251–52, 82 *L.Ed.*2d 462, 474–75 (1984) (same).[2] Furthermore, any infringement on associational rights is amply justified by the State's compelling interest in assuring that private-sector employees' right to unionize and to engage in collective bargaining is implemented.

In addition, defendants claim that both the right to free exercise of religion and the right of parents to control the rearing of their children are at stake. The right of parents to "direct the upbringing and education of [their] children" as enunciated in *Pierce v. Society of Sisters,* 268 *U.S.* 510, 534, 45 *S.Ct.* 571, 573, 69 *L.Ed.* 1070, 1078 (1925), clearly is not implicated in this case. Allowing lay teachers to unionize does not interfere with any parental decision making authority. We will, nonetheless, conduct the *Smith* "compelling state interest" analysis required for hybrid

---

[2] *See also* Jane Rutherford, *Equality as the Primary Constitutional Value: The Case for Applying Employment Discrimination Laws to Religion,* 81 *Cornell L.Rev.* 1049, 1103 (1996) (stating that the State can infringe on employers' associational rights by requiring employers to include disfavored groups); Charles Fried, *Individual and Collective Rights in Work Relations: Reflections on the Current State of Labor Law and its Prospects,* 51 *U. Chi. L.Rev.* 1012, 1023 (1984) (stating that the NLRA, 29 *U.S.C.A.* §§ 151–169, protects workers' right to associate by abridging the employers' right not to associate with union members).

claims. *Smith, supra,* 494 *U.S.* at 881–82, 110 *S.Ct.* at 1595, 108 *L.Ed.*2d at 887.

We are persuaded that the State of New Jersey has a compelling interest in allowing private employees to unionize and to bargain collectively over secular terms and conditions of employment.

We agree with the Appellate Division that

for purposes of ... defendant[s'] facial constitutional challenge on the New Jersey right to organize, we conclude that there is a compelling State interest which outweighs the claimed burden on defendants' free exercise rights. Article I, paragraph 19 is a fundamental State constitutional right guaranteed to private employees. *Cooper, supra,* 36 *N.J.* at 197, 175 *A.*2d 639. This constitutional provision "reaches beyond governmental action. It also protects employees against the acts of individuals who would abridge these rights." *Id.* at 196, 175 *A.*2d 639. In addition to the lay teachers' fundamental right guaranteed by the State Constitution is the fact, observed in *Culvert, supra,* 753 *F.*2d at 1171, *that the State has a compelling interest in the "preservation of industrial peace and a sound economic order."* Moreover, defendants' concerns over the infringement on their free exercise rights are alleviated to a great extent by the fact that New Jersey, unlike the NLRB and jurisdictions such as New York and Minnesota, does not have a labor board regulating private employees. Rather, any legal relief sought by plaintiff must come from the courts. The judiciary can avoid or prevent any undue interference in the ecclesiastical concerns of the schools through the application of "neutral principles" and insure that the "least restrictive means" are employed in the bargaining relationship. 42 *U.S.C.A.* § 2000bb.

A longstanding principle of First Amendment jurisprudence forbids civil courts from deciding issues of religious doctrine or ecclesiastical polity. This prohibition does not apply to civil adjudication of purely secular legal questions. *Elmora Hebrew Ctr., Inc. v. Fishman,* 125 *N.J.* 404, 413, 593 *A.*2d 725 (1991). Courts can decide secular legal questions in cases involving some background issues of religious doctrine, so long as they do not intrude into the determination of the doctrinal issues. *Id.* at 414, 593 *A.*2d 725. In such cases, courts must confine their adjudications to their proper civil sphere by accepting the authority of a recognized religious body in resolving a particular doctrinal question, while, where appropriate, applying neutral principles of law to determine disputed questions which do not implicate religious doctrine. *Ibid.* "Neutral principles" are wholly secular legal rules whose application to religious parties does not entail theological or doctrinal evaluations. *Id.* at 414–15, 593 *A.*2d 725. Our Court in *Fishman* pointed to the example, at issue in that case, of an orthodox rabbi the scope of whose duties only a religious authority could decide, but whose contract, or non-religious condition of employment, a civil court could determine. Nonetheless, our Court has stressed that neutral principles "must always be circumscribed carefully to avoid courts' incursions into religious questions that would be impermissible under the first

amendment," *id.* at 415, 593 *A.2d* 725, because "there are many cases in which court intervention is simply inappropriate because judicial scrutiny cannot help but violate the first amendment." *Id.* at 416, 593 *A.2d* 725.

Professor Laycock criticizes reliance on neutral principles in this context. In his view, such reliance ignores the church's resulting loss of autonomy and avoids the required in-depth constitutional analysis. In addition, Laycock is concerned that distinctions required by such an approach are difficult for secular courts, unversed in theological subtleties. *Laycock, supra,* 81 *Colum. L.Rev.* at 1400, 1409 n. 270.

     \*      \*      \*      \*      \*      \*      \*      \*

However, in spite of these concerns, we conclude that reliance on the doctrine of neutral principles will prove proper and efficacious. The concerns of secular intrusion expressed in *Catholic Bishop* are not nearly as substantial here because of the absence of a leviathan-like governmental regulatory board. Concern over a court's ability to make the necessary distinctions between the secular and the theological is, in our view, no obstacle given the anticipated nature of the collective bargaining process.... As for the concerns regarding church autonomy: while these are legitimate, they are outweighed in this situation by the compelling governmental interest expressed in our State's constitutional provision guaranteeing the rights of working men and women.

[290 *N.J.Super.* at 389–91, 675 *A.2d* 1155 (emphasis added).]

As noted by the Appellate Division, "[t]he Diocese's concern seems rooted in its objection to collective, not individual, bargaining." *Id.* at 394, 675 *A.2d* 1155. Many lay elementary-school teachers presently have individual contracts with the Diocese. The high-school-lay teachers have a collectively-negotiated contract with the Diocese. In both instances, secular issues have been negotiated without apparent fear of violating the Free Exercise Clause.

▮ Defendants also claim that the lay teachers perform a ministerial function and that if they are forced to recognize the union and to engage in collective bargaining, that would amount to an impermissible intrusion into the "precinct" of the church. We disagree.

▮ Ministerial employees are those whose "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Welter v. Seton Hall Univ.,* 128 *N.J.* 279, 294, 608 *A.2d* 206 (1992) (internal quotation marks

omitted). The ministerial defense is raised under the Free Exercise Clause to preclude judicial resolution of an employment dispute or enforcement of an employment agreement. *Id.* at 294–95, 608 *A.*2d 206; *Alicea v. New Brunswick Theological Seminary,* 128 *N.J.* 303, 306, 608 *A.*2d 218 (1992). Even then, the courts should exercise jurisdiction, except "when the underlying dispute turns on doctrine or polity." *Welter, supra,* 128 *N.J.* at 293, 608 *A.*2d 206. Otherwise, courts should not abdicate their duty to enforce secular rights. *Ibid.*

The present case deals with the right to negotiate terms and conditions of employment collectively rather than the enforcement of a contract of employment. *See J.I. Case Co. v. NLRB,* 321 *U.S.* 332, 334–35, 64 *S.Ct.* 576, 579, 88 *L.Ed.* 762, 766 (1944) (stating that collective bargaining generally does not result in employment contract, but rather, sets terms for a collective bargaining agreement for current and future employees). Thus, defendants' reliance on *Welter, supra,* 128 *N.J.* 279, 608 *A.*2d 206, and *Alicea, supra,* 128 *N.J.* 303, 608 *A.*2d 218, is misplaced.

## VI

In sum, we hold that requiring defendants to bargain collectively with plaintiff pursuant to Article I, Paragraph 19 of the New Jersey Constitution over the terms and conditions of employment set forth in this opinion does not violate the Religion Clauses of the United States Constitution. We remand the matter to the Chancery Division for it to order an official representational election, if same has not occurred, to determine whether plaintiff has the support of the majority of the lay teachers. If plaintiff receives that support, then the Diocese of Camden is ordered to recognize plaintiff as the lay elementary-school teachers' representative and to bargain collectively with plaintiff in accordance with this opinion.

The judgment of the Appellate Division is modified and affirmed. The complaint is reinstated and the matter is remanded

to the Chancery Division for further proceedings consistent with this opinion.

*For modification and affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.