789 A.2d 682 (2000)
347 N.J. Super. 301
SOUTH JERSEY CATHOLIC TEACHERS ORGANIZATION, et al., Plaintiffs,
v.
DIOCESE OF CAMDEN, et al., Defendants.
Superior Court of New Jersey, Chancery Division, Atlantic County.
Decided March 23, 2000.
*683 Benjamin Eisner for Plaintiffs (Spear, Wilderman, Borish, Endy, Spear and Runckel, P.C., Haddon Heights, Attorneys).
Alan R. Schmoll, Mt. Laurel, for Deft. Diocese of Camden (Capehart & Scatchard, P.A. Attorneys).
Lawrence Berg, Cherry Hill, for Defts. St. Joseph Lay Teachers Assoc. and Gloucester Catholic Lay Teacher's Assoc. (Marshall Dennehey Warner Coleman & Coggin, P.C. Attorneys).
Gerard W. Quinn and Lloyd D. Levenson, Atlantic City, for Defendants St. Mary's Church and St. Joseph's Church (Cooper Perskie April Niedelman Wagenheim & Levenson, P.A. Attorneys).
GIBSON, J.S.C.
I. Nature of Action
This is a dispute between rival labor unions in which the court has been asked to determine which entity may act as the bargaining representative for lay teachers at two Catholic high schools. The plaintiff union and several of its members claim that the two defendant unions were illegally created and then wrongfully recognized by the parishes that own the high schools and the Diocese within which they operate. The defendant unions deny any wrongdoing *684 and affirmatively seek a declaration as to their legitimacy. They are joined in that position by the parishes as well as the Diocese. Procedurally, these claims are before the court by way of cross-motions for summary judgment; all parties support their position by invoking the right to organize and bargain collectively as guaranteed by the New Jersey Constitution.
II. Findings of Fact
Plaintiffs include several individual teachers and the union in which they are members, that is, the South Jersey Catholic Teachers Organization (hereafter SCTO). Defendants include the two unions that were created as a result of organizational elections which took place in 1997, the Gloucester Catholic Lay Teachers Organization (hereafter GCLTO) and the Saint Joseph's Lay Teachers Association (hereafter SJLTA). Also named as defendants are the two parishes that own the high schools in which each of those unions operate, Saint Mary's parish in Gloucester County (hereafter St. Mary's) and Saint Joseph's in Hammonton (hereafter St. Joseph's). The final defendant is the Diocese of Camden (hereafter Diocese) which exercises certain supervisory powers over these and other Catholic schools within its jurisdiction.[1]
For a number of years prior to 1997, the SCTO acted as the exclusive bargaining representative for all of the lay teachers in the eight Catholic high schools which operate within the Diocese. Each of those schools is subject to supervision by the Bishop for the Diocese, both spiritually and administratively. The Diocese sets tuition, establishes wage limits and has the authority to hear appeals from teacher grievances. It also selects the principal and the vice principal for each school. On the other hand, each school maintains a level of independence. For example, each has its own administration and faculty. Although the Diocese has approval power for all teaching applicants, the hiring and firing of lay teachers generally occurs at the local level. The Diocese sometimes makes loans to a school but each school is responsible for its own funding and each administers its own budget. Also, each of the eight schools is either a separate corporate entity sponsored by the Diocese or it is owned and sponsored by a parish within the Diocese, which is itself a separate corporate entity. For example, Saint Joseph's High School is owned and operated by St. Joseph's parish in Hammonton; Gloucester Catholic High School is owned and operated by St. Mary's parish in Gloucester County. In addition, all of the schools are physically separate; that is, they are located at separate sites throughout the Diocese.
In 1981, the Diocese and teacher representatives from all eight high schools met and agreed that a council should be formed for purposes of improving communications among the teachers, the school administrations and the Diocese. The result was the formation of an entity known as the Secondary Contracted Teachers Council (SCTC). The areas of common concern which were identified included educational policy, problem solving procedures and wages and fringe benefits. With regard to wages and fringe benefits, the Council was to be given the exclusive right to negotiate with the Diocese. Although the agreement was in writing, it was stipulated to be "tentative" and was subject to approval by the faculties at each of the schools. No document or certification has been submitted *685 that indicates that that approval was ever obtained. Nevertheless, the Council was created and it acted as the teachers' representative in subsequent negotiations. Indeed, several such contracts were negotiated over the years, each of which covered a specific term, usually three years. The 1981 Agreement itself made no reference to duration.
Not including the contracts which were negotiated following the contested 1997 elections, the most recent collective bargaining agreement covered the time period from September 1, 1994 to August 31, 1997. By that time the Council had changed its name to the SCTO.[2] Included in the 1994 contract between the SCTO and the eight Catholic high schools (referred to in the agreement collectively as the "Diocese") were provisions relating to wages, employee benefits and certain noneconomic subjects. One such provision gave the Superintendent of Schools for the Diocese the authority to resolve teacher grievances. The participants in the negotiations that lead to that agreement included the SCTO, the Diocesan Superintendent and the principals from each of the individual schools.
For some time prior to 1997 many, if not most, of the lay teachers at Gloucester Catholic and St. Joseph's High School were dissatisfied with the manner in which they were being represented by the SCTO. For example, the Gloucester Catholic teachers were disgruntled by SCTO's refusal to recognize the site representative that they had selected. Most of the dissatisfaction, however, was generated by the SCTO's reaction to the failure to reach a new contract at the expiration of the 1994-97 contract. Contrary to the wishes of the majority of the teachers at Gloucester Catholic and St. Joseph's, the SCTO decided to strike. Not only was the decision to strike contrary to their wishes but the attitudes expressed by SCTO's leadership and the tactics they embraced were viewed as offensive. For example, at one of the union meetings, SCTO's president referred to the Bishop as a scum-bag and suggested that he was someone who could not be trusted. Since the Bishop is not only the administrative head of the Diocese but also its spiritual leader, many of the Catholic teachers at the defendant schools saw these remarks as insulting to them and their religion. Another example of the conduct which most of the teachers found offensive was the decision by the SCTO to invoke the cooperation of the Teamsters. Once involved, the Teamsters threatened to use sound trucks and bull horns to disrupt the classes which were being conducted by the teachers that had chosen to cross the picket lines.
In the face of the above, several of the lay teachers at the defendant schools decided to explore the possibility of organizing separate unions. Petitions were circulated to that effect in September of 1997 and shortly thereafter representative elections were held. Although all of the members of SCTO at the two schools were given notice of the petition and the subsequent election, those that still supported the SCTO chose to boycott the election. The result was that a majority of the teachers at each of the two schools elected to form new unions, GCLTO for Gloucester Catholic and SJLTA for St. Joseph's. After electing officers, the new unions then sought and received recognition from the Diocese and the parishes; collective bargaining agreements were negotiated thereafter. By then, the SCTO had also negotiated a new contract and the strike ended. As part of the negotiations *686 that lead to that contract, the SCTO took the position that the new unions were unlawful and that it, the SCTO, still represented the lay teachers in all eight schools.[3] However, all sides agreed to disagree on this issue and to allow the question to be decided by the courts. This suit was initiated three months later.
Although the above findings complete the relevant chronology, there are certain additional facts that bear on plaintiffs' claim that the election process was flawed. For example, as part of the organizational efforts by the teachers that later formed the GCLTO, a leadership role was assumed by the Athletic Director at Gloucester Catholic, Gerald Scharff (hereafter Scharff). Scharff later became the president of that union. Scharff is not involved in the hiring or firing of teachers but he does make recommendations regarding the hiring of coaches and coaching assistants. He also supervises coaches, set the salaries of the assistant coaches and had been involved in the discharge of certain coaches in the past. With regard to the SJLTA, one of its organizers and former president was Gary Petito (hereafter Petito). Mr. Petito works in the guidance office and is also a teacher and coach. Some months following the election, he was asked to make recommendations concerning the hiring of new lay teachers.
In addition to plaintiffs' claim that Scharff and Petito should not have been involved in the election, they also contend that other school leaders exercised undue influence in the elections. For example, at one of the schools, the principal's office was used for the collection of election ballots and organizers were permitted to use the school's public address system. Plaintiffs also point out that the Diocese is paying the attorneys fees for the defendants in this litigation. In addition, they complain that some of the teachers, when interviewed for their jobs, were questioned by the administration as to their willingness to cross a picket line in the event of a strike. Finally, plaintiffs have supplemented the factual history by submitting evidence that in January of 2000 six of the lay teachers that are currently represented by the SJLTA expressed their wish to join, or as the case may be, rejoin the SCTO, thereby undermining the SJLTA's majority status.
III. Legal Conclusions
Plaintiffs' case has two fundamental components. First, they claim that the constitutional right of the individual plaintiffs to organize and collectively bargain was violated, initially by defendant unions by purporting to represent the lay teachers at the two Catholic high schools, and thereafter by the parishes and the Diocese when they agreed to recognize them. Essentially plaintiffs contend that the new unions cannot exist as independent bargaining units, that is, independent of the SCTOat least not in this setting. Secondly, plaintiffs claim that even if the creation and subsequent recognition of these new unions was proper, the elections which produced them were not; that is, the elections were the product of undue influence by the school administrations. Defendants deny these claims and affirmatively seek a declaration as to the legitimacy of the new unions.[4]
*687 In assessing these competing claims, all parties agree that the beginning point in the analysis is Article 1, Paragraph 19 of the New Jersey Constitution. The relevant portion of that Article provides that "[p]ersons in private employment shall have the right to organize and bargain collectively." N.J. Const. art. I,¶ 19. Although no one challenges the jurisdiction of this court, it is worth noting that the Supreme Court of this State has consistently held that our courts have the authority to resolve disputes under this Article. See e.g. S.J. Catholic School Teachers v. St. Teresa, 150 N.J. 575, 584-85, 696 A.2d 709 (1997). The National Labor Relations Act (NLRA), which normally preempts states from acting on matters within its scope, has been held not to apply to lay teachers in church operated schools. Id. at 583-584, 696 A.2d 709 citing NLRB v. Catholic Bishop, 440 U.S. 490, 504-07, 99 S.Ct. 1313, 1320-22, 59 L.Ed.2d 533, 543-45 (1979). It is also undisputed that our State Constitution represents a valid legal basis for a cause of action alleging interference with the right to organize and bargain collectively. Comite Organizador v. Molinelli, 114 N.J. 87, 96, 552 A.2d 1003 (1989); see generally Richard A. Goldberg & Robert F. Williams, Farmworkers' Organizational and Collective Bargaining Rights in New Jersey; Implementing Self-Executing State Constitutional Rights, 18 Rutgers L.J. 729, 743 (1987).
Unfortunately, there are no statutory provisions which flesh out the parameters of this Constitutional Article. Nor, despite the body of case law broadly construing this provision, see generally Goldberg and Williams, supra, 18 Rutgers L.J., at 743, are there any New Jersey cases which directly address the issues now confronting this court. It is thus appropriate to look to federal case law for guidance, including rulings by the National Labor Relations Board (NLRB), the administrative body that resolves disputes arising under the NLRA. As noted by our Supreme Court, since the rights and remedies available to employees under Article I, paragraph 19 remain unclear, adjudications under the NLRA are considered "appropriate and helpful guidelines." Comite Organizador v. Molinelli, supra at 98, 552 A.2d 1003. On the other hand, given the lack of a statutory foundation for those rulings here, "they are in no sense binding." Cooper v. Nutley Sun Printing Co., Inc. 36 N.J. 189, 200, 175 A.2d 639 (1961). Moreover, in view of the somewhat unique circumstances of this case, it is an open question as to just how helpful the federal rulings are.
Despite the absence of clear precedent, there are certain dynamics that are fundamental and thus helpful to the analysis. To begin with, it is plaintiffs' burden to prove the violations they allege. The court will not disturb the status quo unless that burden has been met. Secondly, despite the limitations that preclude unconditional reliance on the case law and rulings under the NLRA, the federal experience is nevertheless useful in attempting to understand the parameters of the rights that are at issue. Comite Organizador v. Molinelli, supra at 98, 552 A.2d 1003. Thirdly, there are certain identified public policies that underlie these rights and they should be kept in mind when one attempts to apply paragraph 19 to this particular factual setting. See e.g. S. Jersey Catholic School Teachers v. St. Teresa, supra at 600, 696 A.2d 709. Finally, it is appropriate that one apply equitable principals to the resolution of disputes of this nature. Cooper v. Nutley Sun Printing, Inc., supra at 198-200, 175 A2d 639.
Returning now to the constitutional article, that is, the right of persons in private employment to "organize and bargain collectively," N.J. Const. art. I, ¶ 19, it is *688 helpful to examine more closely the conduct which plaintiffs claim to have been unlawful. Leaving aside for the moment plaintiffs' challenge to the election process itself, it is undisputed that the lay teachers in the defendant schools are in "private employment." It is also clear that a majority of them chose to "organize" their own unions. Following the selection of the GCLTO and the SJLTA as their bargaining representatives, those entities then successfully negotiated "collective bargaining agreements." Since the right of lay teachers to engage in each of those steps is facially supported by our Constitution, one may legitimately ask what it is about those actions that plaintiffs see as constituting an actionable wrong. Plaintiffs have not cited anything in the Constitution itself, or in the New Jersey cases which have dealt with it, which would indicate that what happened here violates any previously defined policy or a judicially created rule of law. Instead, plaintiffs point to the history of the bargaining process up until 1997, the so-called "recognition agreement" of 1981 and the federal rulings that they believe support their position. I find these arguments unpersuasive.
As for the bargaining history, plaintiffs are correct that the SCTO and/or its predecessor acted as the exclusive bargaining representative for the lay teachers at all of the eight high schools during the period from 1984 to 1997. Although St. Joseph's High School was inadvertently left out of one of the collective bargaining agreements, it is clear that during the above time period the majority of the lay teachers in the eight high schools were content to act as a single bargaining unit. Plaintiffs are also correct that the history of the bargaining process is a significant factor in determining the appropriateness of a bargaining unit. See Lay Fac. Assoc. v. Newark Archdiocese, 122 N.J.Super. 260, 276, 300 A.2d 173 (App.Div.1973). This is particularly true under the federal legislation. See General Electric Company, 180 NLRB 1094, 1095, 1970 WL 26105 (1970); Westinghouse Electric Corporation, 227 NLRB 1932, 1933, 1977 WL 8354 (1977); Kalamazoo Paper Box Corp., 136 NLRB 134, 136, 1962 WL 16122 (1962).
Despite its significance, however, bargaining history is but one of the several factors that should be considered in assessing the legitimacy of new bargaining units. Kalamazoo Paper Box Corp., supra; Archibald Cox, et al. Labor Law, Cases and Materials at 274-276 (12th ed 1996); 48 Am. Jur. 2d, Labor and Labor Relations § 1291 et seq. (1994). Nor is it appropriate to view bargaining unit designations as exclusive. In other words, the fact that a certain group of employees may share sufficient areas of interest to qualify as a bargaining unit does not mean that there is only one unit into which those employees may legitimately fit. Indeed, there may be several qualifying units. Cox, et al., supra.; 48 Am. Jur. 2d, supra at § 1286. Thus, it is incorrect to suggest that, because of the common interests that these teachers share, an eight school bargaining unit such as the SCTO is the only unit appropriate for collective bargaining purposes. Ibid.
Having said that, however, does not necessarily mean that the defendant unions qualify as bargaining units or that the parishes and the Diocese acted properly in recognizing them. To resolve those issues, it is necessary to look at all of the factors that are relevant to bargaining unit designations. Although this subject was generally referenced in one New Jersey case, Lay Fac. Assoc. v. Newark Archdiocese, supra, the parameters were not defined; nor was the court confronted with the kind of factual setting that is involved here. Thus, it is again appropriate to look *689 to the federal experience. See generally, Cox, et al., supra at 274-276; 48 Am. Jur. 2d, supra at § 1291 et seq. As already noted, a variety of factors have been considered relevant to the question of the "appropriateness" of a bargaining unit. Ibid. The most commonly identified factors are: similarities with respect to work performed, similarities regarding qualifications and wages, frequency of interchange among the employees, geographic proximity of the working sites, integration of the work process, history of the bargaining process and the stated desires of the employees. Cox, et al., supra; Kalamazoo Paper Box Corp., supra at 137; NLRB v. Purnell's Pride, Inc., 609 F.2d 1153, 1156 (5th Cir.1980).
If one applies these considerations here, it is clear that certain factors support plaintiffs' unit and some support defendants' units. Indeed, if equal weight is given to each factor, the greater number seem to support plaintiffs. However, not all factors are equal in weight and, as already noted, this is not an "either-or" process; that is, even when there is a single employer, more than one group of employees may constitute "a unit appropriate" for collective bargaining purposes. Cox, et al., supra at 276; 29 U.S.C.A. § 158. As stated by Professor Cox, the term "community of interest" refers to the combination of factors. Nor does it lend itself to mechanical application. Cox, et al., supra at 276; see also 48 Am. Jur. 2d, supra at § 1286.
Plaintiffs nevertheless contend that in this setting, the SCTO should be the only appropriate bargaining unit. In so arguing, they emphasize the history of the bargaining process, the commonality among the teachers (including the similarities in working conditions, wages, and qualifications), as well as the supervisory role of the Diocese. Defendants, on the other hand, point to their right of self-determination, the fact that they work for different schools, their geographic separation from the other schools, their distinct status as parish sponsored schools and the differing philosophies between the teaching groups regarding the nature of their role, both at work and in the bargaining process. It is their position that the views of the lay teachers in their units are so opposed to those of the majority of the teachers in the SCTO, that to compel them to utilize the SCTO as their representative, effectively means that they will be disenfranchised.
In evaluating these conflicting arguments, defendants' position is more persuasive. As a threshold matter, it is important to recognize that whether one considers state or federal law, employee choice, although not dispositive, must be given considerable weight. In New Jersey, for example, the freedom of choice in selecting one's bargaining agent has been identified as the "very essence of collecting bargaining." Ind. Dairy Workers, etc., v. Milk Drivers, etc., Local No. 680, 23 N.J. 85, 96, 127 A.2d 869 (1956) (citations omitted). Even under federal law, employees are to be given the "fullest freedom" in exercising their right to choose a bargaining representative. 29 U.S.C.A. § 159(b); NLRB v. Harry T. Campbell Sons' Corporation, 407 F.2d 969, 975-76 (4th Cir.1969). Thus, to say that the lay teachers at the defendant schools are constitutionally guaranteed the right to choose their own representative but to then invalidate their current choice because they share certain common interests with teachers at other schools and/or they had previously chosen to be part of a different bargaining unit, would take away with one hand what one gives with the other.
*690 Secondly, the fact that the teachers at the defendant schools share a community of interests with lay teachers at other schools in the Diocese, although significant, is also not dispositive. All teachers share some commonality of interests, not just lay teachers at Catholic high schools within the Diocese of Camden. That fact does not bind every lay teacher in the State to the SCTO. Nor does it bind all those in the Diocese. Thirdly, one's exercise of a constitutional right to choose a bargaining representative is not a one-time event. The teachers at the defendant schools did not agree to utilize the SCTO as their representative for all time. Finally, if one evaluates this issue based on equitable considerations, the balance does not favor plaintiffs simply because the SCTO's strength has been somewhat diluted by defendants' choice, or because the number of schools to which displaced teachers may look for employment had been reduced.
Returning to the issue of commonality, despite plaintiffs' arguments to the contrary, there is no clear rule of law, federal or otherwise, that mandates the adoption of plaintiffs' position regarding the nonlegitimacy of defendants' bargaining units. Stated differently, even when one utilizes the "community of interest" factors that have been considered relevant in determining appropriate bargaining units, plaintiffs' right to override the choice that the lay teachers at the two defendant schools have made is not persuasive. It is true, as plaintiffs point out, that the lay teachers in all of these schools share some community of interest. All of them are teachers, all work within the Camden Diocese, all of their jobs are similar, their wages are comparable and they have all been part of a single bargaining unit in the past.
On the other hand, there are also differences and those differences are significant. For example, the defendant schools are geographically separate, not only from each other but also from the other schools in the Diocese. The schools are also smaller. Both of the schools are owned and operated by their parishes, not the Diocese. This factor is particularly significant given the strong interest that these teachers have in maintaining a harmonious working relationship with the community within which they work. Finally, the views of the teachers in the new units differ significantly from those of the SCTO, particularly with respect to the collective bargaining process.
If one balances the similarities that admittedly exist against the differences just enumerated, the best that one can say for plaintiffs' position is that the SCTO may be a more appropriate bargaining unit. However, that is not the test. See 49 Am. Jur. 2d, supra at § 1286 and cases cited. To qualify, the new unions need only demonstrate that each is an appropriate unit. Ibid.; Cox, et al., supra. When one factors into the analysis the constitutionally guaranteed right of self organization and employee choice, the argument favoring the legitimacy of the defendant units becomes even stronger. See generally Ind. Dairy Workers, etc. v. Milk Drivers, etc., Local No. 680, supra.
If the analysis is shifted from an assessment of commonality to a balancing of the equities, Cooper v. Nutley Sun Printing Co., Inc., supra, the support for defendants' position is further enhanced. An equitable analysis requires the court to consider not only the relevant similarities and differences between these competing bargaining units, but also what it is that each side has to gain and lose in this process. The factors that plaintiffs have identified are (1) the SCTO will not be as large and thus may lose some of its bargaining strength and (2) by permitting the *691 defendant schools to remove themselves from the pool of potential employers, there are fewer schools to which a teacher who is let go by one school may then transfer without losing seniority. The factors that defendants have identified are as follows: (1) the undermining of their right of selfdetermination; (2) the loss of an effective voice in bargaining process, particularly with regard to the economic tactics one should choose (e.g. the decision to strike) and (3) the impairment of their ability to work smoothly within the parishes that sponsor them, that is, the requirement that the members of the defendant unions defer their views to those of the SCTO, an entity with which they and their parishes have relatively few connections.
In evaluating these factors, the greater equities favor the defendants. SCTO's loss of some of its strength because of a reduction in membership does not outweigh the loss that defendants' units will suffer if they are compelled to disband. Stated differently, a ruling in defendants' favor will not preclude the SCTO from continuing to act as bargaining representative for most of the lay teachers in the Diocese (175 out of 230). On the other hand, if the court rejects the defendants' position and endorses the result plaintiffs seek, defendants' right to act as independent units would be lost entirely. Even when one factors in the reduction of schools available in the event of transfers by SCTO members, the balance still favors defendants. If one adds to the mix defendants' right of self-determination and the philosophical differences that separate these groups, the support for defendants' position is even stronger.
Before addressing the next component of plaintiffs' challenge, some attention needs to be given to their argument that a ruling in defendants' favor would represent a deviation from the large body of federal law to the contrary. I disagree. To begin with, plaintiffs have cited only two cases that they claim to be "on point," General Electric Co., supra and Westinghouse Electric Corp., supra. Secondly, I do not agree that these cases are on point, or, even if they are, that they are persuasive. The General Electric case is a "decertification" case under the NLRA. 29 U.S.C.A. § 159(c)(1)(A)(ii). The petitioner there, an employee of General Electric, sought to decertify his union as the representative of the production and maintenance workers at one of General Electric's many plants. The union in question had about 90,000 members and it had represented the production and maintenance workers for about twenty years. Since the labor contracts that resulted from that representation were nationwide in their scope and since there was an extensive history of multiplant negotiations, (referred to by the NLRB as the "rock" on which the collective bargaining relationship had been built,) the Board rejected the application and concluded that the long history of the multi-unit bargaining outweighed the petitioner's position. General Electric, supra at 1095.
First of all, this case is factually distinguishable. We are not dealing here with integrated production units of a single employer.[5] These are separate schools that are owned by different entities and which, for the most part, do not interact. The successful completion of the collective bargaining process for the six schools still represented by the SCTO is not necessarily dependent on what happens at the two defendant schools. Nor is there any evidence *692 to support the notion that separation of these schools from plaintiffs unit adversely affect the employers at the individual schools. If there is a strike at St. Joseph's, for example, that is not going to impede operations at some other Diocesan high school or vice versa. In General Electric, in contrast, although the NLRB is not explicit in its rationale, it appears clear that the success of the company's operation there is dependent upon the effective linkage of its' various components.
Factual distinctions aside, the General Electric ruling is simply not very helpful. Other than referencing the history of the collective bargaining process, the NLRB tells us nothing about the factors that would arguably distinguish the units in question. The opinion does not reveal, for example, what these units have in common and what they do not. The Board appears to treat this as a single factor case; that is, collective bargaining history. That may be because the petitioner failed to present any other factors or, it may be that he did so but the Board considered them irrelevant. We are not told. Certainly this ruling fails to consider the factors that were discussed in other rulings such as Kalamazoo Paper Box Corp., supra and NLRB v. Harry T. Campbell Sons' Corp., supra at 975-976. Thus, unless one assumes that the only factor this court needs to examine is the collective bargaining history, the General Electric case is neither on point nor helpful.
The other case that plaintiffs' counsel advances as on point is Westinghouse Electric Corp., supra. This too is a "decertification" case. Petitioner is an employee of a large multiplant electric company who sought to separate the apparatus service plant from the other production and maintenance employees. Once again, the case involves a multiplant operation with a history of multiplant representation, plus consent by the local plant to merge with the larger national unit. The same union involved here was involved in the General Electric ruling and like that case, the NLRB concluded that the history of a multiplant national unit precluded the proposed unit from acting alone. Since, as in the General Electric case, no other factors relevant to a "community of interest" are discussed, for the same reasons discussed above, this ruling is neither "on point" nor helpful. It is also worth noting that what was at stake in the Westinghouse case was an effort to separate one of the service plants from the production and maintenance employees; the latter group was already separated from the rest of the Westinghouse employees. No one in that case was suggesting that all Westinghouse employees had to be in the same union.
The next component of plaintiffs' cause of action relates to the impact of the 1981 agreement, the so-called Recognition Agreement. Plaintiffs argue that that agreement precludes defendants from choosing another unit. I disagree. The 1981 agreement, assuming it is binding on anyone,[6] simply acknowledges the common interests of the Diocese, the eight schools and the teachers to communicate effectively on the subjects of wages, working conditions and other matters and to recognize the Council as the exclusive bargaining representative. It certainly does not purport to bind the parties for all time. Indeed the agreement makes no mention of duration. Generally, when a contract contains no express term as to duration, it is terminable at will or after a "reasonable time." In re Miller, 90 N.J. 210, 219, 447 A.2d 549 (1982). Thus, other than underscoring the bargaining history and the commonality of interests shared by these *693 schools, both of which have been previously considered, I do not see how an invocation of the 1981 agreement changes the analysis.
I am not persuaded, for example, that by having a teacher representative from each school sign the 1981 agreement that all of the lay teachers at all of the schools, including future teachers, gave up their right to ever seek a representative other than the Council. Nor do I agree that, having once been a member of the Council or its successor, that the ability of such teachers to choose a new representative was dependent on their getting the permission of their original union.[7] Although the lay teachers at St. Joseph's and Gloucester Catholic were bound to bargain through the SCTO during the term of their collective bargaining agreements, once those contracts expired they were free to reconsider the make-up of their bargaining unit and, if appropriate, choose a new representative. That is what they did.
Before considering the final component of plaintiffs' claims, that is, the election process, it is useful to assess defendants' actions in accordance with the public policy considerations that are generally recognized as being advanced by labor legislation; that is, (1) the right to self organization and employee choice and (2) the fostering of industrial peace. S. Jersey Catholic School Teachers v. St. Teresa, supra at 600; NLRB v. Harry T. Campbell Sons' Corporation, supra at 976. As to the first component, it is clear that the events that occurred here advanced rather than impeded employee choice. With regard to industrial peace, although plaintiffs' proofs fail to demonstrate how defendants' conduct has undermined industrial peace, one may argue that, given the lengthy history of bargaining through a single unit, any change in that process might reduce stability between labor and management. On the other hand, if employee choice is to mean anything, change, if not inevitable, is at least natural. Moreover, if what occurred here had any impact on industrial peace, it advanced it. Finally, even if one assumes that, in general, the existence of three bargaining units is less conducive to industrial peace than one, there is no suggestion that that was the experience in this case. As noted, the kind of interdependence among units that exists in a setting such as those involved in the Westinghouse and General Electric cases, does not exist here.
The final component of plaintiffs' claim relates to the integrity of the 1997 elections. Plaintiffs argue that the elections were invalid for several reasons: (1) the SCTO leadership did not receive adequate notice and thus was deprived of an opportunity to campaign for a different result; (2) the elections themselves were tainted because of the allegedly improper involvement and intimidation by the administrations at the two schools; and (3) the presidents chosen by each of the defendant unions were both administrators. Plaintiffs' contend that all of this supports their charge of undue influence and invalidates the new unions as well as the recognition by the schools and the Diocese thereafter.
Plaintiffs have cited no case law, either at the federal or state level, that requires the voiding of a bargaining unit election based on the activity described here. Nor, as a matter of first impression, *694 am I persuaded that such should be the law. There is no question that, to be valid, elections regarding bargaining representatives must truly represent the sentiment of the employees and not be a product of undue influence or control by the employer. See generally NLRB v. North Shore University Hosp., 724 F.2d 269, 272 (2d Cir. 1983); Ind. Dairy Workers, etc. v. Milk Drivers, etc., Local No. 680, supra at 96, 127 A.2d 869. On the other hand, unless the alleged taint is clear or the potential for taint is high, an election should not be overturned. NLRB v. North Shore University Hospital, supra at 273. As for the claim regarding lack of notice, the undisputed facts show that members of SCTO were notified; that is, those lay teachers who would have been likely to oppose the defendants' action were notified. They simply chose not to vote. It is true that the leadership had no direct notice but there is no such requirement here. Although such a practice is preferable, defendants' failure to have given direct notice here cannot be considered fatal. See NLRB v. Air Master Corporation, 339 F.2d 553 (3d Cir. 1964).
With regard to the alleged undue influence by each of the administrations at the two schools, the conduct complained of is not of the caliber to cause this court to question the bona fides of the process. The fact that ballots, otherwise secret, were collected at the principal's office at one of the schools, while generally inappropriate given the risk of intimidation, does not, without considerably more, demonstrate a material adulteration of the process. There was no showing here that the principal counted the ballots or that he/she knew how a particular teacher voted. Nor was the collection itself likely to have been intimidating in this case. The same is true with regard to defendants' use of the public address system.
As for the involvement of Messers Scharff and Petito, for the reasons to be discussed below, I do not see them as "administrators" for these purposes. On the other hand, even if they were, their involvement would not automatically disqualify the resulting units as valid bargaining representatives. Bowman, et al. v. Hackensack Hospital Assoc., 116 N.J.Super. 260, 273, 282 A.2d 48 (Ch. Div. 1975); NLRB v. North Shore Univ. Hosp., supra at 273. As for the Diocese's payment of legal fees, however one views that fact, it occurred after the fact and cannot undermine the integrity of the elections themselves. Absent proof of a "clear and present danger" of a conflict of interest which interfered with the collective bargaining process, resort to disqualification, or in this case invalidation, is inappropriate. NLRB v. North Shore University, supra at 273; NLRB v. Air Master Corp., supra at 556.
Returning to Messers Scharff and Petito, even when one views the facts most favorably to plaintiffs, these two individuals do not hold the type of administrative positions that would make their involvement a threat to the neutrality of the election process. Scharff is the Athletic Director at Gloucester Catholic. Petito works in the guidance office and is a coach at St. Joseph's. As for Scharff, although he does influence the hiring and firing of coaches, he has nothing to say about "teaching" positions. Nor does the collective bargaining process include any rights that teachers may have regarding coaching positions. With respect to Petito, it was not until several months after the elections were held that he was asked to assist in reviewing the qualification of some of the teaching candidates.
The final issue is whether the recent changes in sentiment regarding union affiliation expressed by six of the teachers *695 who are now members of one of the defendant unions should change the result in this case. I think not. The fact that the current majority of the lay teachers at one of the two schools may now want to return to the SCTO is significant and may not bode well for the future of SJLTA as a bargaining unit. However, until the current contract expires this summer, their change of mind cannot affect their earlier choice of a bargaining representative, at least not based on the circumstances presented here. Nor would this change in sentiment have any impact on the status of the GCLTO.
Before concluding, it should be noted that in addition to their other responses to plaintiffs' claims, defendants have also invoked certain affirmative defenses; that is, laches, non-compliance with R. 4:4-1 and plaintiffs' failure to satisfy the requirement of the Anti-Injunction Act, N.J.S.A. 2A:15-51. Given the rejection of plaintiffs' claims, however, these defenses need not be addressed. I would note parenthetically, however, that it is difficult to see how plaintiffs' delay in the pursuit of the remedies sought here has worked any hardship on defendants. The same can be said of the delay in the service of process. As for the Anti-Injunction Act, no case has ever applied that legislation to labor disputes under Article 1, paragraph 19 except with regard to picketing issues. See e.g. Comite Organizador v. Molinelli, supra, S. Jersey Catholic School Teachers v. St. Teresa, supra; Johnson v. Christ Hospital, 45 N.J. 108, 211 A.2d 376 (1965); Lay Fac. Assoc. v. Newark Archdiocese, 122 N.J.Super. 260, 300 A.2d 173 (App. Div. 1973); and Cooper v. Nutley Sun Co., Inc., supra; cf. Ind. Dairy Workers, etc. v. Milk Drivers, etc., Local No 680, supra.
IV. Conclusion
This is a case of first impression in which the court has been asked to determine which union may act as the exclusive bargaining agent for the lay teachers at two Catholic high schools. Based on the undisputed facts and the analysis recited above, my conclusion is that that question should be resolved in favor of the defendants, the GCLTO and the SJLTA. Plaintiffs have failed to demonstrate that the new bargaining units are inappropriate for collective bargaining purposes or that their members could not have chosen a new representative when they did. Nor have the plaintiffs successfully demonstrated that the election process that produced these units was fatally defective. The lay teachers in the two defendant schools have the constitutional right to organize and select their own bargaining representative. Having exercised that right at the expiration of the 1994-97 contract, the weight of the evidence, as well as the equities, supports the viability of the new unions they created. To the extent that there has been a subsequent change in sentiment on the part of some of the teachers at one of the schools, those teachers are free to exercise their prerogative at the expiration of the current contract. However, that does not change the result here. Judgment will be entered accordingly. No costs.
NOTES
[1] The "Diocese of Camden" is a term that can be used to refer to either the geographic area that the Diocese embraces (six southern New Jersey counties) or the office of the Bishop for the Diocese.
[2] Following the submission of these motions, the plaintiff union again changed its name, this time to the Catholic Teachers Union (hereafter CTU).
[3] Not counting the members of the two new unions, the CTU now represents 175 out of 230 lay teachers that teach at the high school level within the Diocese.
[4] As noted, these claims are before the court on cross-motions for summary judgment. No one has challenged the appropriateness of that process. See generally R. 4:46-2; Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995).
[5] Contrary to plaintiffs' contention, the Diocese is not the sole employer of these teachers. A more accurate label is that they have dual employers, that is, the Diocese and their own parishes. See factual findings supra at pp. 304-05, 789 A.2d at 644.
[6] As noted, there is no proof that the 1981 agreement was ever ratified.
[7] In pursuing this issue, one must acknowledge there are legitimate limits to how small a unit can be and still be constitutionally viable. However, one need not define those limits in order to conclude that what defendants did here was permissible. See generally, 48 Am. Jur. 2d, supra at 1297.